**IDEAL TOY CORPORATION, Plaintiff,**

v.

**KENNER PRODUCTS DIVISION OF GENERAL MILLS FUN GROUP, INC. and Twentieth Century-Fox Film Corporation, Defendants,**

and

**Twentieth Century-Fox Licensing Corporation, Counterclaim-Plaintiff.**

No. 77 Civ. 4375 (CHT).

United States District Court, S. D. New York.

Dec. 27, 1977.

Curtis, Morris & Safford, P. C., New York City, for plaintiff; Lewis H. Eslinger, John A. Mitchell, Stuart A. White, Leonard J. Santisi, William F. Lawrence, New York City, of counsel.

Rogers & Wells, New York City, for defendants and counterclaim-plaintiff; Herbert C. Earnshaw, John B. Koegel, New York City, Cooper, Epstein & Hurewitz, Beverly Hills, Cal., of counsel.

## OPINION

TENNEY, District Judge.

Plaintiff Ideal Toy Corporation ("Ideal") commenced this action in August of this year seeking a declaration that its production and distribution of certain toys—sold under the trademark "Star Team"—did not infringe any rights possessed by the defendants Twentieth Century-Fox Film Corporation ("TCF"), producer of the film "Star Wars," and Kenner Products Division of General Mills Fun Group, Inc. ("Kenner"), holder of a license from TCF to produce toys based on characters from the film. Plaintiff sought and obtained an order enjoining defendants from instituting parallel state court actions during the pendency of this action. *Ideal Toy Corp. v. Kenner Products Div'n of General Mills Fun Group, Inc.*, 77 Civ. 4375 (CHT) (Oct. 26, 1977). Before the order was entered, the defendants filed an answer and counterclaims, seeking injunctive and monetary relief from Ideal. They then moved for a preliminary injunction, contending that Ideal's toys infringed TCF's copyright in "Star Wars" and constituted unfair competition with "Star Wars" and with Kenner's toys. For the reasons set forth below, the preliminary injunction is denied.

### Facts

The movie "Star Wars," released by TCF on May 25, 1977, is now, after less than seven months, the most financially successful movie of all time, having surpassed the movie "Jaws" in late-November. To date the gross box office rentals in the United States and Canada are in excess of $120 million. (Tr. at 78). Seeking to capitalize on the movie, TCF has granted, since the end of 1976, more than 20 licenses for "Star

Wars" products, from school supplies and bubble gum to bedspreads and model flying robots. (*Id.* at 100–101). This merchandising campaign included an attempt to interest toy manufacturers in producing "Star Wars" toys. Marc Pevers, Director of Business Affairs for TCF, wrote to an officer of Ideal on February 14, 1977, announcing the upcoming release of "Star Wars" and soliciting Ideal's attendance at a presentation at the annual Toy Fair in New York in late-February. (Exh. F). A similar letter was written to Zeke Rose of Ideal's public relations firm. (Exh. E). A large, glossy black brochure containing pictures and descriptions of "Star Wars" (Exh. G) was enclosed with each letter.

Ideal did not attend the presentation at the Toy Fair, but Rose spoke to Pevers by phone at that time, informing him that

> Ideal had no interest in the product, that science fiction films were chancy, films themselves [were] risky as merchandising properties because of their frequently short release life.
>
> Furthermore, there was no television series and also that Star Wars itself was a rather ordinary property and all the elements of Star Wars had been done before, that there was a complete lack of interest on Ideal's part.

(Tr. at 90). Pevers received the same response from Herb Sand, an Ideal executive, and from another member of Ideal's public relations firm. (*Id.*). Unlike Ideal, however, Kenner expressed interest in the license and entered into an agreement with TCF in April 1977.

In May 1977, "Star Wars" was released to critical acclaim and virtually instant popularity. According to Ideal, this acclaim, together with the continued popularity of the television show "Star Trek", the publicity surrounding the American space shuttle,

the expected release of other space movies, and the fact that other toy companies were bringing out space toys, led Ideal to reexamine its opinion of such toys.[1] (*Id.* at 11, 211, 246). Julius Cooper, Ideal's Senior Vice President for Research and Development, testified that the market for toys is very much affected by fads and trends, which often originate in a motion picture, a television show or a "happening." Mr. Cooper stated that "the toy industry tries to capitalize on these events because children are very well aware of what is current and we therefore always try to bring out toys, games, dolls that take advantage of these fads." (*Id.* at 204–05).

Cooper testified that prior to May 1977 Ideal had been doing development work on two types of space toys: a giant, almost-full-size robot and an updated version of its earlier line of toys marketed under the trademark "Zeroid."[2] (Id. at 211–12). At the end of May, however, Ideal determined that it was necessary to capitalize on the space toy fad as quickly as possible. Accordingly, Cooper testified, Ideal "decided to go back into [its] old archives of tools and molds and see what toys [it] perhaps could make with the least amount of investment." (*Id.* at 214). The first toy it reexamined was the "Alien Invader," a "Zeroid-type toy," *i. e.*, a nonhumanoid, robot-like character with a thick body, tractor treads set in a square base for locomotion and two arms emerging from its "shoulders." (Exh. 11 at 26; Exh. 12). Ideal decided, however, that Alien Invader was too complicated, involving cams and gears. (Tr. at 215). (Indeed, the toy had been described in the 1970 catalogue as "a mass of mirth provoking mechanics." Exh. 11 at 27).

Ideal then went on to look at the Zeroids themselves. All but one of these toys had

---

1. Ideal also made another attempt to discuss possible licenses with TCF. In late-June, Pevers met with Stuart Simms, a marketing executive with Ideal, to discuss a TCF series called "Young Daniel Boone." Simms, however, opened and closed the meeting by asking whether there were any licenses available on "Star Wars" which would interest Ideal. Pev-

ers indicated that no such licenses remained. (Tr. at 91–92).

2. The trademark "Zeroids" was the subject of trademark registration No. 915,641, registered on June 29, 1971; the mark "Zeroid Alien" was registered as No. 921,497 on October 5, 1971. (Affidavit of Richard M. Rabkin, sworn to November 14, 1977, Exhs. 3 & 5).

arms capable of throwing small missiles and were therefore rejected because Ideal has operated since 1970 under a safety regulation that its toys not launch projectiles. (Tr. at 216, 278). Attention then focused on the remaining Zeroid, "Zogg," and the decision was made to adapt that toy. The 1970 Zogg had an elaborate head of squarish shapes with six tube-like protrusions in the "face" and an antenna grid on top. (Exh. 12). This head constituted about one-third of the cost of the toy and was eliminated in favor of a simple hemispherical dome of clear plastic. (Exhs. 6A & 14). Cooper testified that this change was made for ease of manufacture and because Cooper wanted the light contained in the original Zogg to shine through the entire head. (Tr. at 270).

In order to make the toy less expensive, Ideal also took out the motor drive (id. at 216) and eliminated the laser weapon which was held in Zogg's hands and which lit up and blinked. (Id. at 267; Exh. 11 at 24). The latter change was apparently occasioned by the elimination of the electrical parts which activated the light in the laser. (Tr. at 267). Finally, the color of the original Zogg (at least of the example produced in evidence and the photograph in the original catalogue) was green with purple stripes. (Exhs. 11 at 24 and 12). The new toy became grey with either blue or red stripes.

The result was the toy called "Zeroid", one of the three challenged in this action. (Exh. 6A). With bubble head it stands approximately five inches high. Zeroid rides on a base slightly-less-than-three inches square and one-and-a-quarter inches high in which are set two rubber tractor treads three-eighths-of-an-inch wide. On the front of the base is a pattern which appears to represent electronic circuitry. Set on top of the base is a round body two inches high and slightly-less-than-two inches in diameter. The round body is grey in color, as is the base, and has slats through which may be glimpsed a solid plastic cylinder which surrounds the internal battery case: the color of this cylinder is either blue or red, and its projection through the slats in the body gives the appearance of blue or red striping in the body. The remainder of the figure consists of a clear plastic cylinder topped by grey "shoulders" and the clear dome described above; this entire top part swivels 360°. From the "shoulders" are appended two rotating "arms" approximately two inches in length which extend, when pointing down, to about mid-way in the round body, i. e., about two and one-half inches from the ground. A light placed in the middle of the top part of the toy shines through the clear plastic.

Having concluded that it wished to bring out a "complete line of toys," Ideal went on to consider other possibilities. (Tr. at 219). Cooper testified that "[w]e wanted two good guys and that's why we chose the second robot to go along with the Zeroid." (Id.). Once again Ideal went back into its archives to look for a mold and chose a human figure patterned after a detective named "J. J. Armes." (Id. at 218; Exh. 16). Cooper stated that this figure was chosen because it was "the easiest mold to get into." (Tr. at 220). He also testified that the selection was made from among three existing figures, J. J. Armes prevailing over "Captain Action" (the toy which provided the mold for the "Knight of Darkness," the third of the figures challenged in this action) because J. J. Armes was a smaller figure and could be sold more cheaply, and over "Action Boy," Captain Action's partner, because Action Boy was not a fully-jointed figure like J. J. Armes. (Id. at 285). He added that Action Boy was substantially smaller than J. J. Armes (id.), although the evidence would seem to show that both were approximately nine inches tall. (Compare Exh. 11 at 26 with Exh. 16).

As with the Zeroid toy, alterations were made in the earlier product. Wanting to make the figure look like a robot, Ideal "went into the mold," engraving various lines and metallic-appearing features which then appeared as raised surfaces on the molded toy. (Exh. 7A). No changes were made in the basic mold and construction of the figure, however. (Tr. at 218–21). A completely new head was created, made of green vinyl with two deep-set, black eyes.

Finally, the entire body was molded out of a shiny silver plastic with a very metallic appearance. The name given to this figure was "Zem 21." Ideal had previously used the trademark "Zem XXI" in connection with a predecessor of the spaceship now sold with the Star Team toys under the name "Star Hawk."[3] Cooper testified that "21" was substituted for "XXI" in the trademark because Arabic numerals were easier for small children to read than Roman numerals. (Tr. at 295).

Having chosen two robot friends, Ideal decided that a complete line of toys required a third figure to create an adversary relationship with the two robots and thus sought to find a "bad guy." (*Id.* at 222). Again the archives were examined, and Ideal selected a figure known as "Captain Action." (*Id.*; Exh. 19). Captain Action was also a fully articulated figure. In its original form the basic figure could be used in conjunction with any of nine separate outfits—each including a face mask—so that Captain Action could become any one of nine characters such as Batman, the Lone Ranger or Captain America. (Tr. at 224–25, 284; Exh. 18). The Captain Action figure was chosen for the evil character in part because it was larger than the two good-guy characters. (Tr. at 287).

Captain Action was transformed by molding the identical body in black plastic instead of flesh tones and by adding a new head. (Exh. 8A). Whereas Captain Action had a standard adult male head which was transformed into different characters by means of face masks, the new figure was given an entirely new and "villainous" head, which, Cooper testified, was created by Ideal's sculpturing department under his instruction to "[m]ake up your own fantasy of what kind of a villain you want with a black head to go with a black body." (Tr. at 226). The result is dominated by a spherical helmet out of which extends a beak-like nose. The impression of deep set black eyes is created by two curving silver bands which meet at the "beak." Below the "beak" is a silver screenlike "mouth" which is painted on a narrow protruding band which extends all the way around the head. Other screens, not painted silver, are located on the sides of the helmet. The figure is clothed in a black tightly-fitting outfit, the entire chest of which is made of a shiny silver fabric. A broad black belt surrounds the waist and is imprinted with what appear to be electronic devices. The figure wears large black boots and a knee-length black cape which is rounded at the corners. It is sold with a grey-colored "ray gun," which fits into either of its hands. While most of the costume is a new creation, the boots and the weapon were carried over from the Captain Action figure. (*Id.* at 299).

The name given to the evil figure was "Knight of Darkness."[4] Cooper testified that the name had first been used for a "black knight in a very modern black knight type of outfit" who was intended to be part of a series of "villainous motorcycle riders." (Tr. at 223, 296).

These three figures, the only three challenged here, are sold in conjunction with a spaceship. (Exh. 9). The ship is round, approximately 13 inches in diameter and 9 inches high. It is designed to hold one Zeroid, with which it comes supplied. A spring-loaded mechanism in the base slowly rotates a revolving platform to an open position, allowing the Zeroid to exit the ship by means of a ramp which folds down to the ground. The ship is identical in most respects to that sold in conjunction with the old Zeroid line. A mechanism which formerly activated the Zeroid motor so that the Zeroid would automatically emerge from the ship under its own power was eliminated as unnecessary since the new Zeroid has no motor. (Tr. at 228). The color was changed from purple and yellow to red and charcoal grey. (*Compare* Exh. 9 *with* Exh. 11 at 26). The old ship was sold

---

**3.** The mark "ZEM XXI" was registered with the United States Patent Office on May 16, 1972, Registration No. 933,873. (Exh. AE).

**4.** This name was registered as a trademark on May 10, 1977, Registration No. 1,065,368. (Exh. AF).

under the trademark "Zem XXI," as discussed above. The new ship is sold under the name "Star Hawk," which apparently has not been registered as a trademark.

The entire set of three action figures and spaceship is sold under the trademark "Star Team." This mark was registered on August 10, 1971 (Reg. No. 918,014) and was apparently an acronym for "Space Travel and Reconnaissance," although no trademark claim was made for those terms and they are not repeated in the current use. The mark as registered and as used today has two "electrons" circling the words "Star Team." (Exh. AH). It was formerly used in conjunction with a line of toys including an equipment belt and other life-sized space accessories which could be worn and used by a child.

The three action figures—Zeroid, Zem–21 and Knight of Darkness—are sold in virtually identical packages. A trapezoidal box contains an arch-like opening through which the full figure may be viewed. The name of each figure is set forth above the opening in "roll-away" letters. The box has a background depicting outer space, predominantly black, with spaceships and planets. On the front of each package, to the left of the opening, a montage of the three figures is displayed, with Zem–21 and Zeroid in accurate proportion to each other and with the head and upper body of a slightly larger Knight of Darkness shown behind the two figures. Above this montage two spaceships are rushing toward an exploding object. The trademark "Star Team" is prominently displayed below the opening against a purple background and in letters somewhat smaller than those used for the name of the figure. The name "Ideal" or the mark "Star Team" or both appears on every face of the packaging save that which explains the operation of the batteries and light for Zeroid. (Exhs. 3, 6, 7 & 8). Cooper testified at trial that this packaging was being changed somewhat as a result of earlier discussions between TCF and Ideal. He stated that at a conference between representatives of the two companies the montage of the three figures "was the thing that Twentieth Century seemed to object to the most of anything," and that "to avoid any conflict at all" that montage was being replaced on each of the three boxes by a depiction of the individual characters (Exhs. 26, 27, 28) contained in that particular package, a change which will be reflected in the next printing of packages. (Tr. at 235–36, 318; Exhs. 29, 30, 31).

The defendants challenge these three figures and the manner in which they are sold as unlawful usurpation of their rights in the movie "Star Wars" and three characters depicted therein, the robots (or "droids") R2–D2 and C–3PO and the evil Darth Vader. The Court attended a screening of the movie and has also examined still photographs of the characters. R2–D2 (also spelled "Artoo-Detoo") is a small robot of nonhumanoid appearance which, as depicted in the motion picture, appears to be approximately three to four feet tall. It consists of a cylindrical body, whitish in color, with a dome-shaped top of a silver metal. This top swivels and is equipped with computer lights and a radar eye. R2–D2 rides on "thick clawed legs" (the description contained in TCF's promotional brochure, Exh. G) which are attached directly to the cylindrical body just below the domed top. A third leg emerges on occasion from the lower front of the robot. The legs maintain the cylindrical body off the ground by approximately 10–12 inches. R2–D2 speaks "only to other robots in a series of electronic sounds." (Exh. G).

C–3PO (also "See-Threepio") is a humanoid robot of a gleaming brass- or gold-colored metal. His metal plates overlap at various joints but do not cover his stomach area, through which complicated wiring is displayed. He is a "human-robot relations specialist" and often accompanies R2–D2. (*Id.*).

Darth Vader is a huge, malevolent figure dressed entirely in "flowing black robes," including a black cape which reaches to the floor. His face is masked by a "grotesque breath screen" with sharp angles and menacing protrusions. (Exh. G). He wears a black helmet of flared design and is armed

both with a "light saber" and his command of "The Force," a cosmic power tapped by the "Jedi Knights," a vanishing breed of crusaders for good from whose ranks Darth Vader has defected. Darth Vader has significant confrontations in the movie with his former teacher, Ben (Obi-Wan) Kenobi, who is now the Jedi Knight—mentor of the young and heroic Luke Skywalker, and with Luke himself; the first battle is fought with light sabers and the second with spaceships.

The right to make toys based on these characters was licensed by TCF to Kenner, as discussed above. Kenner has plans to market toys based on 12 of the characters, including the three discussed above. (Tr. at 118; Exh. 2). These figures will be approximately two to four inches high. (Tr. at 130; Exh. 2). Currently, however, no figures have been produced, and none was introduced into evidence, either as a model or as an actual production figure. Instead, Kenner is now selling an "Early Bird Certificate Package" containing a paper certificate which entitles the recipient to "receive between February 1—June 1, 1978, before they're available in stores, posable Action Figures of: Luke Skywalker, Princess Leia, Chewbacca, and Artoo-Detoo." (Exh. 2, trademark notations deleted). Craig Stokely, vice-president of product planning for Kenner, testified that these four were chosen to "introduce an array of products that would have strong boy-girl appeal and represent four of the strongest characters for our initial introduction." (Tr. at 120).

A great deal of the defendants' evidence concerned a nationwide survey undertaken by Marketing Information Systems, Inc. ("MISI"). That organization selected three shopping malls in each of the four United States Census regions and directed and employed independent "supervisors" to administer the survey in each of those 12 locations. (Tr. at 28). In each location interviews were conducted with 35 children between the ages of six and ten and 35 adults who were parents of children in that age group; these groups were broken down so as to be evenly balanced by age and sex. The interviewers were instructed not to interview the parents of children who had been interviewed and vice versa. (Exh. B). The interviewees were first screened by age and sex in a central location and then taken to a separate office or storefront where they were interviewed privately. (Tr. at 47). Once in that location they were confronted with samples of each of plaintiff's three challenged figures in their packaging; the toys, marked "A," "B" and "C," were not removed from these packages during the interview. The interviewers were instructed to refer to the toys only by letter. (Exh. B). After allowing time to view the toys, the interviewers asked a series of questions, beginning with "Have you seen or heard of any of these toys before?" If the answer to this question was "Yes," the interviewer was instructed to ask "Which ones?" and then "Where did you see or hear of this toy before?" The interviewers were also asked to "probe" the last question, that is, to seek "specification, clarification and detail" by the use of phrases such as "anything else?" or "what do you mean by that?" Following these two questions—or, if the answer to the first question was "No," then following that first question— the interviewer was to ask "If you were going to tell your parents or friends about this toy, how would you describe it? (PROBE) What else would you tell them about it?" and "Although you may already have mentioned it, what do you think the name of this toy is?" Following these questions for all three toys, the interviewers were instructed to put away the toys and ask questions concerning movies and television shows that were rather obviously intended to elicit what, if any, previous exposure the interviewee had to "Star Wars."

These results were then sent to MISI and tabulated by hand according to whether each interviewee made an "association" between any or all of these toys and the movie "Star Wars." "Association" was defined as "the spontaneous, volunteered mention of 'Star Wars' or the names of one or more specific characters from the Star Wars movie." (Exh. A at 1 n.*). Ray Berland, who directed the survey for MISI

gave as examples of responses marked as "association" " 'it looks like a Star Wars toy' or 'it looks like Darth Vader.' " (Tr. at 66). He also noted the following upon cross-examination:

[Mr. Berland]: . . . They either named Star Wars or mentioned the name of a character from Star Wars.

Q. Just mentioned it?

A. Yes.

*Id.* at 69. As examples of interviewees who failed to make an association he gave those who "mentioned a black knight from the movie or said 'I think I saw it in a movie.' " (*Id.* at 39).

The survey produced the following results. Of the 422 children surveyed, 65% made an "association"; of the 426 adults, 59% made an "association." These results were broken down further: of those who had seen the movie, 76% of the children and 83% of the adults made an "association." Of those who had some "other exposure" to the movie,[5] 61% of the children and 42% of the adults made an "association." Finally, 33% of the children and 23% of the adults who had *no* previous exposure to the movie made an "association" between the toys and the movie. (Exh. A at 1).[6]

The survey was also tabulated according to whether a "name association" was made. That phrase was defined as "the spontaneous, volunteered mention of the names of one or more specific characters from the Star Wars movie, while the Star Team packages were in view of the respondent." (Exh. A at 5). This tabulation, unlike the "association" table, was not broken down by previous exposure; thus, a full comparison with the more general "association" tabulation cannot be made. However, only 31% of the adults surveyed made a "name association" (compared to the 59% who made an "association"), as did 44% of the children (compared to 65% for "association").

*Discussion*

■ The Court is now asked to grant a preliminary injunction against the "manufacture, importation, packaging, promotion, sale or other distribution" of the three Ideal Star Team figures on the ground that these toys infringe TCF's copyright in the film "Star Wars" and that, as currently sold, these toys constitute unfair competition with TCF and Kenner both under the common law and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[7] On this motion, the burden is on the defendants to

5. The term "other exposure" was defined as "either having seen the 'Making of Star Wars' TV show; and/or newspaper/magazine arti- cles about Star Wars; and/or ownership of merchandise reflecting the Star Wars theme." (Exh. A at 1 n.**).

6. The percentages of "association" were broken down by individual toys in the following table. However, this tabulation does not reveal anything concerning "name association" with each of the figures.

| | Total (422) | | Toy "A" (Knight Of Darkness) (422) | | Toy "B" (Zem–21) (422) | | Toy "C" Zeroid (422) | |
|---|---|---|---|---|---|---|---|---|
| Children 6–10 Years Old | # | % | # | % | # | % | # | % |
| Made an association | 276 | 65 | 224 | 53 | 143 | 34 | 208 | 49 |
| Did not make an association | 146 | 35 | 198 | 47 | 279 | 66 | 214 | 51 |
| Parents Of 6–10 Year Old Children | (426) | | (424) | | (426) | | (426) | |
| | # | % | # | % | # | % | # | % |
| Made an association | 251 | 59 | 198 | 46 | 123 | 29 | 169 | 40 |
| Did not make an association | 175 | 41 | 228 | 54 | 303 | 71 | 257 | 60 |

Exh. A at 6.

7. In their Counterclaims, the defendants alleged violation of their trademark rights in "Star Wars" and its characters. Counterclaims ¶ 48. That allegation cannot be sup- ported and was in fact excluded by the defendants for the purposes of the hearing on the preliminary injunction, as was any allegation concerning design patents. (Tr. at 6–7).

show either (1) probable success on the merits and the possibility of irreparable harm, or (2) that there are serious questions going to the merits and that the balance of hardships tips sharply in their favor. *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973). The Court concludes that the defendants have not met this burden. On the first variant of the test, they have failed to show either probable success on the merits or the possibility of irreparable injury. The second version avails them even less, for an examination of the balance of hardships in this case shows that it tips in favor of the plaintiffs: a preliminary injunction would completely disrupt an established and ongoing program of promotion and distribution of its Star Team toys, damaging Ideal's good will and causing financial and organizational hardship to the company. Any hardship to the defendants is purely speculative, particularly considering the absence of any actual "Star Wars" action figures on the market at the current time.

## The Merits

Analysis of the merits of the defendants' claims in this case requires this Court to consider the relation between a claim of copyright infringement and claims of unfair competition. Ideal, the alleged infringer, would have the Court recognize two distinct types of claims—"misappropriation," or the unauthorized copying and use of that which belongs to a competitor, and "misrepresentation," or the selling of another's goods as one's own. Plaintiff's Supplemental Memorandum 1–2. Having thus parsed out the two types of claims, Ideal argues that the first—"misappropriation"—is solely and exclusively governed by federal statutory copyright, *id.* at 3, while the second—"misrepresentation"—exists in both federal statutory law and state common law but is limited to "attempts to palm off unlabeled (or falsely labeled) goods." *Id.* at 7. Ideal finds this analysis compelled by the companion Supreme Court cases of *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). The Court, however, disagrees.

In *Sears* and *Compco* lower courts had found that patents granted for two objects—a pole lamp in *Sears* and a fluorescent lighting fixture in *Compco*—were invalid and thus could not give rise to causes of action for patent infringement even though the "infringing" products were either "substantially exact" copies, *Sears*, 376 U.S. at 226, 84 S.Ct. at 786, or "the same, to the eye of the ordinary observer," in "overall appearance." *Compco*, 376 U.S. at 235, 84 S.Ct. 779. Both lower courts found, however, that the "infringers" had been guilty of state law unfair competition for the same activity which was permitted under the federal patent statute. The Supreme Court reversed, stating that "when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. . . . [I]f the design is not entitled to a design patent or other federal statutory protection, then it can be copied at will." *Id.* at 237–38, 84 S.Ct. at 782.

More recently, the Supreme Court has indicated that the *Sears-Compco* doctrine was not meant to indicate that the states had totally relinquished the power to legislate or otherwise to grant protection in the copyright area. *Goldstein v. California*, 412 U.S. 546, 559, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Rather, a problem under *Sears-Compco* arises only when a state attempts to protect something which federal law declares to be unworthy of protection. *Id.* at 569–70, 93 S.Ct. 2303. In such a case, as in *Sears* and *Compco*, state law must give way.

In the instant case, however, there is no sign that Congress intended to cast a movie such as "Star Wars" into the public domain, free even from state protection from copying. Thus, while the Court concludes that Ideal's toys do not *copy* TCF's movie or the characters therein, this conclu-

sion does not preclude a further exploration of any rights the defendants may have against copying or "misappropriation" under state law. Such law would not act to grant protection against copying to that which supreme federal law had declared unworthy of such protection but would merely allow the court to consider aspects of copying not covered by federal law. Accordingly, the Court will examine first the claim of copyright infringement and then proceed to the claims of "misappropriation" and "misrepresentation" under state as well as federal law.

### Copyright

The obvious issue on a claim of copyright infringement is whether the alleged infringer *copied* that to which another party possessed a copyright. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). That issue is made even more difficult than normal, however, when the allegedly infringing item is in a different medium and of a different nature from the copyrighted item, as in this case where the Court is asked to determine whether a three-dimensional toy infringes the copyright in a two-dimensional movie.

As a matter of the law in this circuit there can be little doubt that a three-dimensional object can infringe a copyright in a two-dimensional object. In 1914 the court of appeals held that a dramatic presentation involving characters introduced as "Nutt" and "Giff" infringed the copyright in the two-dimensional cartoon "Mutt and Jeff." *Hill v. Whalen & Martell, Inc.*, 220 F. 359 (2d Cir. 1914). Ten years later the court concluded that a three-dimensional reproduction of the horse "Sparky" infringed the copyright in the cartoon "Barney Google." *King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir. 1924). More recently, the court in *Geisel v. Poynter*

*Products, Inc.*, 295 F.Supp. 331 (S.D.N.Y. 1968), found that three-dimensional dolls infringed the plaintiff's copyright in his "Dr. Seuss" cartoons.

Similarly, the law in this circuit is also clear that a copyright in a dramatic work such as a movie or a play can extend to cover the characters contained therein under certain circumstances. In the most famous statement on this subject, Judge Learned Hand drew upon Shakespeare for his example of the basic law:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). Thus, a court studying a claim of character infringement must first look to the degree to which the character is developed. M. Nimmer, *Nimmer on Copyright* § 30, at 134.2 (1976) (*"Nimmer"*). Professor Nimmer concludes that "[a] character is most readily protectible where both the original work and the copied work consist of cartoons or other graphic representations rather than 'word portraits.'" *Id.* at 135. This analysis is appropriate here where the characters said to be protected are visually depicted in the movie.[8]

---

**8.** The plaintiff relies on the 9th Circuit case of *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*, 216 F.2d 945 (9th Cir. 1954), *cert. denied*, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955), to support its argument that the three "Star Wars" characters at issue

here are not within the copyright protection granted to the movie itself. This case is not the law of this circuit, and this Court declines an invitation to follow it for the reasons set forth by Judge Wollenberg in *Walt Disney Prods. v.*

Both Nimmer and Judge Hand would seem to agree, however, that the proper focus in such a case lies not on the quality of the original characters but on establishing whether the allegedly infringing characters can be said to be "copied" from the original. *Id.* at 134.1. Copying is inherently difficult to prove directly. In most cases, the courts have no objective evidence of the process by which the challenged object was developed and thus are forced to rely on the inferences which may be drawn from two basic facts: access and substantial similarity. *Reyher v. Children's Television Workshop, supra,* 533 F.2d at 90. Even here, where there is some objective evidence of the development of Ideal's toys in the form of preexisting toys which were adapted into the current form, it is still necessary for the court to look to access and substantial similarity to reach a conclusion on copying.[9]

This task is made difficult, however, by dissimilarity of the media in which the toys and the characters are embodied. The characters from "Star Wars" are elements in a drama; they have "character" because they are part of a plot in which they interact with each other. Thus, they have attributes which are suggested by the movie itself. The toys have no such qualities as they exist in their basic, copyrighted form.[10] The child who plays with them will give them certain qualities, but these will be the creation of the child and not of Ideal. Thus, any comparison will have to be made

solely on the basis of physical appearance; in other words, the *sole* attribute of the dolls will have to be compared to only *one* attribute of the movie characters. Furthermore, this comparison is itself made even less satisfactory by the different dimensions in which the characters are found. Neither the Court not anyone else is capable of placing the toys and the characters side by side in order to compare them. Kenner has produced no physical toys; the pictures contained on their "Early Bird Certificate Package" appear not to be pictures of the coming toys but artist's representations of the characters as they appear in the movie. (Exh. 2). The Court has been provided with "stills" taken from the movie itself which it can place alongside the toys and which it can use to refresh its recollection of the movie. These photographs, being two-dimensional, cannot be turned and viewed from various angles in conjunction with the toys. Moreover, the characters thus depicted have no "size," and their color seems to vary from picture to picture depending on the type of light. Limitations of this nature perhaps contribute to the fact that courts which have found interdimensional copyright infringement seem to have done so only in the relatively simple artistic world of copyrighted cartoons and where the copies challenged were either virtually exact reproductions of the original, *King Features Syndicate v. Fleischer, supra,* 299 F. at 534; *Hill v. Whalen & Martell, Inc.,*

---

*Air Pirates,* 345 F.Supp. 108, 111–13 (N.D.Cal. 1972).

**9.** Access need not be discussed since it is clear that Ideal had been provided in February 1977 with several copies of the promotional brochure circulated by TCF; this date was well in advance of Ideal's adaptation of its toys to their current form. The plaintiff, however, would have the Court dispose of the issue of substantial similarity in equally summary fashion by granting collateral-estoppel effect to an apparent finding by the United States Customs Service that the Ideal toys were not "substantial copies" of the characters from "Star Wars." Plaintiff's Reply Memorandum 9, *quoting* 19 C.F.R. § 133.42(a). Since the Court lacks direct evidence of the Customs decision and thus is not able to discern the grounds on which it was based and the precise conclusion it

reached, the Court cannot allow the Customs decision to have collateral-estoppel effect at this time.

**10.** For purposes of copyright comparison, the Ideal toys are being compared to the characters in the "Star Wars" movie independent of any packaging or promotion of either item. These additional elements will be considered under the misappropriation aspect of the unfair competition claim. *Cf. Ideal Toy Corp. v. Adanta Novelties Corp.,* 223 F.Supp. 866, 867–68 (S.D. N.Y.1963). To extend the comparison beyond the characters themselves and consider allegations that certain aspects of the packaging of the Ideal toys pick up various "themes" from "Star Wars" or to consider the various promotional aspects of Ideal's toys or the other toys with which the three figures are sold seems both inappropriate and disastrously unwieldy.

*supra* (names "Nutt" and "Giff" also used); *Geisel v. Poynter Products, Inc., supra,* 295 F.Supp. at 347–48 (name "Dr. Seuss" also used), or reproductions of "the essential characteristics" of the original with only "[s]light differences and variations." *Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.,* 73 F.2d 276, 278 (2d Cir. 1934), *cert. denied,* 294 U.S. 717, 55 S.Ct. 516, 79 L.Ed. 1250 (1935) ("Betty Boop").

Leaving these problems aside, the Court, in evaluating substantial similarity, is instructed to determine "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.),* 360 F.2d 1021, 1022 (2d Cir. 1966).[11] While such a test does not involve a critical dissection of the objects being compared, it does allow a certain summary of the similarities and differences which exist. *See id.* at 1023. Based on its examination of the three questioned toys and the movie "Star Wars," the Court concludes that the similarities which exist are not substantial and are sufficiently explained and justified by the evidence concerning the development of the Ideal toys. Thus, the Court finds considerable doubt that the defendants will prevail on the merits on their claim of copyright infringement.

Briefly, the similarities and differences are these: Both Darth Vader and Knight of Darkness are large, black-colored figures sporting capes and black helmets. However, the Knight's head is quite different in appearance, being rounded and simple in line while Vader's head is a complex of sharp edges and protrusions. Furthermore, the Knight's torso is dominated by a shiny, silver metallic tunic, and he sports a prominent grey ray-gun, a weapon totally different from that of Vader.

C–3PO and Zem–21 are both humanoid robots made of metal; both display metallic joints and protrusions. However, Zem–21 is a bright silver color, while C–3PO is distinctly bronze- or gold-colored. More importantly, Zem–21 sports a rather grotesque green head which dominates the rest of his body and which is totally unlike C–3PO's bronze- or gold-colored head. Finally, Zem–21's body is distinctly supple (a product of its "human" origins), while C–3PO's body is more mechanical and rigid.

At the short end of the line, both R2–D2 and Zeroid are small, round, computer-type metallic robots with domed tops and two appendages. However, Zeroid is grey while R2–D2 is predominantly white; Zeroid is "thin" while R2–D2 is "thick"; Zeroid moves on rather sizable tractor treads and its "arms" do not reach the ground, while R2–D2 moves on its much slimmer appendages alone.

The defendants contend that the toys should be examined together as well as separately and that similarities may be found in the relationships among the three. While this examination threatens to take the Court far afield,[12] a limited examination of the overall relationship will reveal no greater similarity. It must first be noted that the three Ideal figures are *not* sold as a single unit, although they are advertised together. (Exh. 33). If they are considered as a unit, however, they should also be considered with the other toy in the "Star Team" line, the "Star Hawk" space ship. Taking the toys as a group, then, they are similar to the characters in the movie in that a tall, black-robed evil figure in a black helmet is an adversary to a medium-sized metallic humanoid robot and a smaller computer-type, round, metallic robot. The relative proportions of the three figures appear to be approximately the same in both toys and movie. Besides the differences in individual physical appearance discussed above, other differences are apparent as well. The Zeroid flies in a round, domed space ship;

---

11. A more complex, two-step process was announced in *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946). *See Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1162–69 (9th Cir. 1977). The two steps of that process seem to have been merged into the single lay-observer test for substantial similarity announced in *Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.), supra,* 360 F.2d at 1023 n.2.

12. *See* note 10 *supra.*

nothing comparable is found in "Star Wars." The toys have a direct adversary relationship between the robots and the Knight of Darkness, while in the movie the robots are never shown in direct confrontation with Darth Vader, although they may be said to be on the opposite side from him. Rather, the movie confrontations are between Vader and the Princess, Vader and Kenobi and Vader and Luke Skywalker.

■■■ The Court has no doubt, and Ideal did not deny, that Ideal sought to make use of the themes embodied in these three characters and in the movie itself. A theme is not protectible, however; it is only the idea which stands behind a protectible expression. In the *Nichols* case, Judge Hand concluded that there were certain similarities between the two plays at issue in that case but that these were similarities of theme and not of expression. Thus, even if it were known that the "infringer" had intentionally copied the theme, no copyright-infringement action would lie.

> If the defendant took so much from the plaintiff, it may well have been because her amazing success seemed to prove that this was a subject of enduring popularity. Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background. Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote. It was only a part of her "ideas."

*Nichols v. Universal Pictures Corp., supra,* 45 F.2d at 122. The defendants have no more right to a monopoly in the theme of a black-robed, helmeted, evil figure in outerspace conflict with a humanoid and a smaller non-humanoid robot than Shakespeare would have had in the theme of a "riotous knight who kept wassail to the discomfort of the household" and who had conflicts with "a foppish steward who became amorous of his mistress." *Id.* at 121.

■■ Moreover, the Court finds entirely credible the explanation given by Cooper concerning the changes that were made in preexisting toys and the reasons for developing these toys.[13] Certainly Cooper was aware of "Star Wars" and intended to capitalize on the fad which it was creating. He was also concerned with possible infringement and instructed those developing the toys to avoid copying the "Star Wars" characters. (Tr. at 221, 226, 298). Since objective evidence of independent creation may overcome a finding of substantial similarity, *Fisher-Price Toys v. My-Toy Co.,* 385 F.Supp. 218, 221 (S.D.N.Y.1974); *Nimmer* § 139.4, at 606, such evidence should be even more instructive in the absence of a finding of substantial similarity.

The defendants argue that the Court should look to the MISI survey as an indication that lay observers find a "substantial similarity" between the Ideal figures and the characters in "Star Wars." Defendants' Trial Memorandum 12. Aside from the dangerous precedent of allowing trial by the court to be replaced by trial by public opinion poll, the court is unable to find this poll supportive of the inference which the defendants wish to draw. First, only 31% of the adults and 44% of the children made a "name association" between the toys and characters in the movie, even after repeated questioning concerning names and descriptions. Second, the validity of the entire poll is called into question by the astounding figure that 33% of the children and 23% of the adults who had *no* previous exposure to the movie associated these toys with the movie. This latter finding suggests at least two conclusions at odds with the defendants' position: perhaps in the immediate wake of this, the most successful movie in history, *any* obviously space-related toys will conjure up an association with "Star Wars"; perhaps the administration of the survey contained certain basic errors.

---

**13.** No evidence was introduced at the hearing that Ideal had at its disposal existing molds which, when adapted for use in a space-theme toy, would have resulted in toys completely different from the "Star Wars" characters.

Third, the toys were displayed by themselves, with no "Star Wars" items to compare them to. As discussed above, there are similarities between the characters and the toys. These similarities are less obvious upon direct comparison, however, to the limited extent that such comparison is possible. There is little doubt that these figures will call to mind the movie, particularly since they are lifeless figures to which any observer can attach the attributes of the "Star Wars" characters without fear of contradiction.

Finally, "association" seems to have been indicated in most instances by the comment that one of the toys "looks *like*" a "Star Wars" toy. (Tr. at 66, emphasis added). Such a comment may be taken to indicate only an awareness of a similarity between the toy and a character; it is not the same as a sense that the toy was *copied* from the character or that a *substantial* similarity existed, perceptions which might be more accurately conveyed by the response that a certain toy "*is*" Darth Vader, for example. Thus, the survey may be taken as evidence that Ideal has tapped the vein discovered by the defendants, to paraphrase Judge Hand. Such tapping is not infringement, however.

*Unfair Competition*

■ Although the defendants have failed to establish probable success on the merits of their claim of copyright infringement, the Court must also address the broader claims of state and federal unfair competition. Traditionally, unfair competition was limited to claims that one party had attempted to "pass off" his goods as those of another, to mislead the buying public into purchasing his goods while thinking they were getting those of someone else. However, contemporary New York unfair competition law also encompasses a broader range of unfair trade practices generally described as the misappropriation of the skill, expenditures and labors of another. *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 781 (2d Cir. 1964).

■ *Misappropriation.* Relying on this broader type of protection against unfair competition, the defendants argue that the similarity in the toys when taken together with the packaging and promotion of those toys "creates the mistaken belief that STAR WARS is the source of these toys." Defendants' Trial Memorandum 21. As support for their argument they rely on cases in which courts have held that one cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is "sponsored" by or derived from something else. In these cases, unfair competition was found to exist even though the sponsoring entity was not, strictly speaking, in "competition" with the product being sold, a situation parallel to that alleged in the instant case. For example, in *American Broadcasting Co. Merchandising, Inc. v. Button World Mfg., Inc.*, 151 U.S.P.Q. 361 (N.Y.Sup.Ct. 1966), the sale of buttons bearing a picture of a green hornet and the legend "Official Member Super Hero Hornet Society" was enjoined because it created the misimpression of sponsorship by the plaintiffs' "Green Hornet" television and radio programs. In all of these cases, however, the misimpression was created by the overt use of a name or other clear symbol by which the public identifies the "sponsor." [14] *E. g., Triangle*

---

**14.** The power of a name or other configuration to symbolize a particular business, product or company is described as "secondary meaning" and receives the full protection of both trademark and unfair competition law. R. Callman & S. Kleinman, *The Law of Unfair Competition Trademarks & Monopolies* §§ 77.1–.2 (3d ed. 1969 & 1976 Cum.Supp.).

The defendants argue at some length that heightened consideration should be given to their claims of unfair competition because of the "secondary meaning" attached to the char-

acters of Darth Vader, C–3PO and R2–D2 and to the movie itself. Defendants' Trial Memorandum 19–21. This reliance on the concept "secondary meaning" is misplaced, however. The defendants describe "secondary meaning" as "commercial magnetism," *citing Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942). That case illustrates the proper use of the term. The *Mishawaka* Court found that the respondent was in error in its use of the petitioner's symbol—a red circular plug embed-

*Publications, Inc. v. Rohrlich*, 167 F.2d 969 (2d Cir. 1948) (use of name "Miss Seventeen" for sale of girdles constituted unfair competition with "Seventeen" magazine).[15]

No such clear symbol has been appropriated here. Ideal has made use of trade names which are completely different from those of the defendants and which were in existence prior to the distribution of "Star Wars." Moreover, insofar as the defendants claim that visual similarities between Ideal's toys and the movie characters create a misimpression of "sponsorship" by or derivation from "Star Wars," the Court has already discussed at some length the similarities between the toys themselves and the movie characters in connection with the allegation of copyright infringement. The

"lay-observer, substantial similarity test" applied on that claim is virtually identical to the comparable unfair competition standard recently announced by the New York State Court of Appeals:

> The essence of an unfair competition claim is that the defendant assembled a product which bears so striking a resemblance to the plaintiff's product that the public will be confused as to the identity of the products. The test is whether persons exercising "reasonable intelligence—and discrimination" will be taken in by the similarity.

*Shaw v. Time-Life Records*, 38 N.Y.2d 201, 206, 379 N.Y.S.2d 390, 395, 341 N.E.2d 817, 820 (1975).[16] Indeed, New York courts have

ded in the center of the heel in the shoes which it manufactured and sold. The public associated this mark with the petitioner's shoes; by using it, the respondent appropriated the petitioner's good will. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 542–43 n. 2, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).

Although the defendants' characters and movie obviously have a great deal of "commercial magnetism," they are not *symbols* of something else. They are not guideposts by which the purchaser finds his way to a particular product; they are the product itself and are capable of protection in their own right, whether through copyright or unfair competition. The defendants also rely on *Fisher v. Star Co.*, 231 N.Y. 414, 132 N.E. 133 (1921). In that case the court found that the cartoon figures "Mutt" and "Jeff" had "secondary meaning," that is, they revealed their origin in the genius of their creator. *Id.* at 432, 132 N.E. 133. Thus, they were symbols of their creator and as such were worthy of protection by him. This conclusion was a necessary antecedent to the court's finding that the cartoonist had a protectible interest in his characters since the court relied solely on unfair competition and did not consider copyright protection. This Court's conclusion that the "Star Wars" characters said to be copied in this case are protectible in copyright obviates the necessity of imprinting these characters with "secondary meaning." *Cf. Hill v. Whalen & Martell, Inc.*, 220 F. 359 (2d Cir. 1914) (protectible copyright in cartoon figures "Mutt" and "Jeff").

**15.** *Accord, Lone Ranger, Inc. v. Cox*, 124 F.2d 650 (4th Cir. 1942) (use of name "Lone Ranger" and cry "Hi, yo Silver" enjoined); *National Lampoon, Inc. v. American Broadcasting Cos.*, 376 F.Supp. 733 (S.D.N.Y.1974), *aff'd*, 497 F.2d 1343 (2d Cir. 1974) (use of name "Lampoon" for television show enjoined as unfair attempt

to suggest association with plaintiff's various enterprises); *Wyatt Earp Enterprises, Inc. v. Sackman, Inc.*, 157 F.Supp. 621 (S.D.N.Y.1958) (use by former licensee of legend "Wyatt Earp . . . official outfit" on clothes bearing a "striking resemblance" to those sold under former license enjoined as unfair competition with television series "The Life and Legend of Wyatt Earp"); *Tiffany & Co. v. L'Argene Products Co.*, 67 Misc.2d 384, 324 N.Y.S.2d 326 (Sup. Ct.), *aff'd*, 37 A.D.2d 699, 323 N.Y.S.2d 642 (1st Dep't), *aff'd*, 29 N.Y.2d 671, 324 N.Y.S.2d 961, 274 N.E.2d 448 (1971) (perfume sold in bottles labelled "Tiffany" and described in terms emphasizing gold and jewelry enjoined as deriving commercial advantage from plaintiff jewelry store's name and reputation); *Vaudable v. Montmartre*, 20 Misc.2d 757, 193 N.Y.S.2d 332 (Sup.Ct.1959) (use of name "Maxim's" for New York City restaurant enjoined as appropriation of good will established by plaintiff's Paris "Maxim's" restaurant.

The defendants also rely on *Aurora Products Corp. v. Schisgal Enterprises, Inc.*, 176 U.S.P.Q. 184 (S.D.N.Y.1972), in which this Court granted an injunction against the use of the name "SEI Night-Time Football" because it constituted an attempt to "trade on the notoriety and good will developed by plaintiff ABC and on the association between the ABC Monday Night Football program" and another game sold under license with ABC. *Id.* at 188. In that case, however, the defendants had previously been enjoined in their use of the name "Monday Nite Football"; the Court found that, in view of the prior infringement, the new name did not "keep a safe distance" from the plaintiff's name.

**16.** The *Shaw* case itself is difficult to classify according to the misappropriation/misrepresentation categories established above. The

suggested that a court's conclusion on the issue of copyright should be conclusive on this type of unfair competition as well: "[a]n appropriation of the general idea is not unfair competition unless it goes to the extent of violating a copyright." *Archie Comic Publications, Inc. v. American News Co.*, 204 Misc. 1060, 125 N.Y.S.2d 919, 922 (Sup.Ct.1953), aff'd, 283 App.Div. 868, 129 N.Y.S.2d 915 (1st Dep't 1954).

 Unfair competition is not limited solely to the considerations relevant to copyright, however, and in evaluating the unfair competition claim the Court must go beyond the simple matter of whether Ideal's *toys* are copies of "Star Wars" or its characters and determine whether Ideal, by the entirety of its merchandising efforts, has attempted to mislead the public into thinking that its toys were "sponsored" by "Star Wars" or derived from it. *See Ideal Toy Corp. v. Adanta Novelties Corp.*, 223 F.Supp. 866 (S.D.N.Y.1963). Having made this investigation, the Court concludes again that the defendants have failed to demonstrate probable success on the merits so as to warrant preliminary injunctive relief.

The first item of consideration is the packaging in which the toys are sold. The defendants claim that Ideal has made use of "key visual elements" from "Star Wars" in their packaging which evoke a very strong consumer identification with "Star Wars," and their witness, Richard Arnesen, so testified. (Tr. at 149–50, 155–56). These elements are: (1) the montage of the three figures described above; (2) the predominantly black background; (3) the "roll-away" lettering; and (4) space ships similar to those in the movie attacking the "Death Star." Defendants' Memorandum in Support of Preliminary Injunction 11–12. The second and third elements are of no consequence, however: black background is virtually universal in depictions of space, and roll-away lettering is a common technique. (Tr. at 234). The first element—the montage—bears some similarity to "Star Wars" and its promotional campaign, but, as described above, it has been removed from all future packaging. The fourth theme—of space ships flying toward an exploding heavenly body—does not necessarily evoke "Star Wars." Certainly, there is no depiction of the "Death Star" weapon on the package. Moreover, the packages must be taken in their entirety: individual details do not matter as much as the entire impression conveyed by the packaging. The names, both of the individual characters and of the entire "team," are prominently displayed on the packages and have no relation to the movie. Finally, the toy figure itself is the most dominant aspect of the packaging as it is fully visible in each package through a transparent plastic window. Thus, the conclusion of lack of substantial similarity in the toys themselves is of particular relevance of the packaging as well.

If one moves beyond the packaging and into the other aspects of Ideal's promotion of these toys, one finds absolutely nothing which could even arguably be construed as misappropriation of the movie or its characters. Most interesting is a "comic book" which is produced by Ideal in conjunction with Marvel Comics Group and given away free of charge in toy stores. (Exh. 32; Tr. at 239). This comic book presents the Ideal toy figures in a drama and is particularly relevant because it more closely approaches the form in which the movie and characters

---

defendant had re-recorded certain of plaintiff Artie Shaw's musical arrangements of tunes for which he did not hold the copyrights. The court found that the arrangements alone were not copyrightable, *id.* 38 N.Y.2d at 205, 379 N.Y.S.2d at 394, 341 N.E.2d at 819, but held that sale of these "re-creations" under the label "Artie Shaw versions" was not permissible. *Id.* at 206, 379 N.Y.S.2d at 395, 341 N.E.2d at 820. The court concluded that it was "impossible to say, as a matter of law, that reasonably discriminating consumers would discern that these 'versions' were not authentic Shaw performances, but were instead attempted recreations by modern day musicians." *Id.* The court relied, in part if not in full, on the "palming off" or misrepresentation standard—the likelihood that a consumer would mistake the Time-Life product for the competing product sold under agreement with the plaintiff. *Id.* Thus, any misimpression created seems to have been as much a product of the label "Artie Shaw versions" as of the similarity of the recordings.

are copyrighted. The story told in the comic book and the personalities of the toys therein are completely different from the characters or story of "Star Wars." The Zeroids and Zem–21 are actively engaged in head-to-head battle with the Knight of Darkness. Zem–21 is an aggressive, combative figure. The Zeroids, who speak in clear English, attack with weapons. The Knight of Darkness is part of a gang, the "Raiders of the Black Nebula," who ride through space on a kind of cosmic insect.

Much to the same effect is the television advertisement for the "Star Team." There is direct confrontation between the Knight and the robots. Children are playing with the toys in a brightly lighted area. The names of the toys are prominently mentioned, as is the name "Star Hawk" for the space ship, which is displayed. The overall impression left by the commercial has no connection with or similarity to "Star Wars."

The defendants argue that the high degree of "association" demonstrated in their survey shows that the prospective purchaser perceives these toys as sponsored by or derived from "Star Wars." In addition to the problems with the survey which the Court discussed in connection with the copyright claim, use of the survey for this purpose must be seriously questioned. Unfair competition, while not requiring actual competition, still must be related to the marketplace: *purchasers or prospective purchasers* of the toys must be misled into thinking the toys are related to "Star Wars." The survey did not attempt, however, to reach persons who were in the market for these toys, nor did it ask questions of those who were in the process of making a purchase. Thus, the comments of District Judge Wyzanski in rejecting a similar study are appropriate here:

> Furthermore, another and most significant reason why the evidence of the poll is inadmissible on the issue of confusion is that under the substantive law the issue is not whether the goods would be confused by a casual observer, (trained or untrained, professional or lay,) but the issue is whether the goods would be confused by a prospective purchaser at the time he considered making the purchase. If the interviewee is not in a buying mood but is just in a friendly mood answering a pollster, his degree of attention is quite different from what it would be had he his wallet in his hand. Many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash.

*American Luggage Works, Inc. v. United States Trunk Co.,* 158 F.Supp. 50, 53 (D.Mass.1957), *aff'd,* 259 F.2d 69 (1st Cir. 1958). A finding of general "association"—that the toys "look like" the movie or remind someone of the movie—does not mean that the prospective purchaser thinks that the toys are derived from the movie or "sponsored" by the movie. Accordingly, the Court attaches little if any weight to the survey as probative of the degree to which consumers have been misled by the efforts of Ideal into thinking the toys are derived from "Star Wars."

*Misrepresentation.* Although the Court has found that the defendants have not established probable success on the misappropriation aspect of unfair competition, it may be argued that Ideal engaged in the more traditional type of unfair competition, *i. e.,* that Ideal attempted to "pass off" its goods as those of the defendants through misrepresentations as to the source of the goods. In exploring whether this type of unfair competition has occurred, the Court must determine whether there is a likelihood that the public will be confused as to the origin of the goods which they are purchasing. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977); *Shaw v. Time-Life Records, supra,* 38 N.Y.2d at 206, 379 N.Y.S.2d at 395, 341 N.E.2d at 820. Thus, it must be asked whether Ideal used " 'reasonable care to inform the public of the source of its product' and to identify its own merchandise 'lest it be mistaken for that of the plaintiff.' " *Id.* at 206, 379 N.Y.S.2d at 395, 341

N.E.2d at 820, *quoting Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119, 59 S.Ct. 109, 83 L.Ed. 73 (1938). This is certainly the core of the trade regulation rights left to state protection by the *Sears* and *Compco* decisions. *See* 376 U.S. at 232, 238–39, 84 S.Ct. 784.

In the instant case, however, there is little likelihood that Ideal's toys will be confused with any competing product or that those toys will be thought to have originated from Kenner or TCF. At the present time the defendants have no comparable toy on the market: Kenner is marketing only its "Early Bird Certificate Package," an item so unique as to be incapable of being confused with any other toy of any kind. There is no likelihood that persons will purchase Ideal's toys thinking that they have purchased Kenner's "Early Bird Certificate Package."

Indeed, the defendants have nothing more to rely on for this aspect of their unfair competition claim than that which was relevant to the misappropriation aspect, *i. e.*, the alleged similarity between the toys and the movie characters and the use of visual images from the movie in the packaging of the toys. The more traditional indications of source—trademarks and trade names—are clearly present on virtually every face of Ideal's packaging and both reveal the source of the toys to be "Ideal" and describe the toys with names which are the property of Ideal and which existed prior to the movie. Thus, the defendants have failed to demonstrate probable success on a misrepresentation claim.

### Lanham Act § 43(a)

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), seeks to prevent confusion among buyers by prohibiting the "use in connection with any goods . . . [of] a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same." Construed broadly, this statute may be found to incorporate both the misappropriation and misrepresentation aspects of the unfair competition claims discussed above. As the defendants recognize, however, "[t]he facts and analysis establishing the likelihood of success on this claim . . . are identical to the basis of the claims for unfair competition." Defendants' Trial Memorandum 39. The Court concludes that probable success on this claim has not been demonstrated for the reasons set forth in the discussion of state-law unfair competition.

### Irreparable Injury

The Court also concludes that the defendants have failed to establish the possibility of irreparable injury. In large part, any injuries incurred by the defendants through the substantive wrongs allegedly committed by the plaintiff will be compensable in money damages and thus are not irreparable.

The Court recognizes that the possibility of loss of "good will" by the defendants and the possibility of harm to the reputation of their products is not readily calculable in dollars and cents. However, the defendants must do more than allege such injury: they must establish it. The Court concludes that they have not done so.

In order to establish this aspect of their case, the defendants put on three witnesses. Each was an employee of TCF or Kenner; each testified only in broad terms as to his company's speculation concerning the possible effect of the sale of Ideal's toys on TCF or Kenner's good will or future marketing of either the movie or the products marketed thereunder. For example, Pevers of TCF testified that "the market *may* be saturated with the Ideal toys, and retailers *might* say 'We don't want to carry the Star Wars line. Everybody has bought the Star Team line.'" (Tr. at 108, emphasis added). Earlier, Pevers was questioned by the Court on this point.

> THE COURT: [The Ideal toys have] been sold for a period of time. Have you noticed such an effect on the marketing of the film, or are you just postulating that it might in the future? These are the things that are in the market. Has the market fallen off for it so far as licensing for the film is concerned since the article has been in the market?

**310**

THE WITNESS: The market has not fallen off because our license authorized products are not out in the market and if these dolls are permitted to continue in distribution the retailers will not buy the authorized dolls because the market will have been saturated with these shoddy imitations.

(*Id.* at 105).

Stokely testified on behalf of Kenner that "[i]t's my opinion that the amount of merchandise offered to the consumer and perceived by the consumer as falling within a licensed property, the greater amount of merchandise offered the greater the dilution and the shorter the life of that property." Furthermore, he testified that the presence of the Ideal toys "represents to the trade that the Star Wars characters are not unique and are not totally offered by Kenner Products" and that this perception weakens the degree of support that the trade will give the Kenner products. (Tr. at 131). No evidence of such perception was presented, however; no persons in the trade were produced, no one testified on this point who was not affiliated with one of the defendants.

Thus, the effect of the sales of Ideal toys on Kenner toys is pure speculation; no objective evidence has been presented that the Ideal toys have weakened or will weaken the market for the "Star Wars" movie or product derived therefrom.

In sum, the Court concludes that the defendants have failed to meet their burden of proof in that they have demonstrated neither probable success on the merits of any of their substantive claims nor the possibility of irreparable injury nor that the balance of hardships tips sharply in their favor. Accordingly, the application for a preliminary injunction is denied.

So ordered.