**AMERICAN GREETINGS CORPORATION and CPG Products Corp., Plaintiffs,**

v.

**EASTER UNLIMITED, INC., d/b/a Fun World, Defendant.**

**No. 83 CIV 7690 (LBS).**

United States District Court, S.D. New York.

Dec. 12, 1983.

608

Cowan, Liebowitz & Latman, P.C., New York City, for plaintiffs; Carol Simkin, William Hart, New York City, of counsel.

Wolder, Gross & Yavner, New York City, for defendant; Stanley Yavner, Jay A. Bondell, Meyer A. Gross, New York City, of counsel.

## OPINION

SAND, District Judge.

Plaintiffs are co-venturers in the creation and marketing of a line of stuffed plush bears, known as "Care Bears." The "Care Bears" are six pastel-colored plush stuffed toys, each carrying a different pictorial representation on its chest. In addition ·to these stuffed bears, plaintiffs also license or sell a number of other products—such as greeting cards and plastic toys—which

utilize the Care Bear concept.[1] A one-half hour cartoon featuring Care Bear characters was aired on nationwide television in April 1983 and rebroadcast last month. The 1983 advertising budget for Care Bear related products is approximately 9.2 million dollars. By year's end, sales of these products will exceed $250,000,000.

Defendant is an importer and seller of what we will here call "Message Bears," [2] also a line of stuffed bear toys. Defendant's four bears carry various messages across their chests. For example, the blue bear's chest reads "Have a Happy Day." The bears come in four colors, several of which are close in shade to a Care Bear color.[3] Both plaintiffs' bears and defend-

ant's bears are produced in approximately ten and six inch versions.[4] In an appendix, we have included copies of exhibits plaintiffs offered in their preliminary injunction application. These reproductions, while not including plaintiffs' distinctive trade dress, offer a rough idea of the appearance of stuffed Care Bears and Message Bears.

Plaintiffs claim that defendant's Message Bears infringe the Care Bear copyright, see 17 U.S.C. §§ 101 *et seq.*, violate Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) and the New York State law of unfair competition. On October 25, 1983, we denied plaintiffs' application for a preliminary injunction, holding that plaintiffs had failed to establish a like-

---

**1.** The six plush animals and their corresponding colors are:

| Name of Bear | Color |
|---|---|
| Bedtime Bear | Green |
| Birthday Bear | Yellow |
| Cheer Bear | Pink |
| Friend Bear | Peach |
| Grumpy Bear | Blue |
| Tenderheart Bear | Light Brown |

Plaintiffs also claim copyrights on four other Care Bear characters, which have not as yet been manufactured as plush stuffed animals. We understand plaintiffs to contend that defendant's products infringed on plaintiffs' rights to both pictorial and sculptural (or stuffed animal) representations of the Care Bears. For example, an exhibit introduced at trial compared defendant's plush bears to two dimensional cartoon representations of Care Bears, which plaintiffs used to advertise their products. In the interest of clarity, our opinion focuses largely on what we view as the most trenchant of plaintiffs' contentions—that defendant's stuffed animals resemble plaintiffs' equivalent toys in a manner violative of federal copyright law, trademark law, and New York State law of unfair competition. We note, however, that, most, if not all, of our findings and conclusions, apply with equal force to all of plaintiffs' contentions.

**2.** "Message Bears," we believe, is the most commonly used term for defendant's products but, defendant concedes, the products go by a number of names. We accept defendant's representation that the term "Care Bears" was only used to refer to defendant's product with defendant's suppliers and sales representatives. Among other names for defendant's bears are "Luv Bears" and "Cuddle Bears."

**3.** Defendant's purple bear clearly has no color equivalent in plaintiffs' stuffed toy line. We

also believe that the bright lime green bear cannot fairly be characterized as similar in color to the soft shade of green adorning plaintiffs' bedtime bear. Two other Message Bears, however, the peach and pale blue models, correspond closely in color to plaintiffs' Friend Bear and Grumpy Bear, respectively.

Defendant also has a bright red "Valentine" bear, which appears to be a close cousin to the four member Message Bear family. This bear, carrying the message, "Guess Who ♡ You" across its chest, is solely a Valentine's Day item, and has not yet appeared on retailers' shelves. The bulk of plaintiffs' allegations are directed at the four Message Bears, and accordingly, our findings and conclusions speak largely to these allegations. But our holding also encompasses plaintiffs' contentions based on the "Valentine Bear," essentially a red plush version of the Message Bear.

**4.** These are accurate measurements only if extended leg length is not included in the calculations. Because plaintiffs' smaller stuffed bears are designed to remain in a seated position, excluding leg length from such calculations seems reasonable. But in the case of plaintiffs' larger bears and all of defendant's bears, which have floppy legs capable of assuming both standing and seating positions, a head to toe measurement might make more sense. Defendant's smaller bears measure between eight and nine inches from head to toe; and its larger bears stand about 14 inches tall. Plaintiffs' larger bears are about an inch shorter than defendant's.

At the time of trial, defendant had not yet commenced shipments of its smaller bears to retailers. Defendant's larger bear and both sizes of plaintiffs' bear are currently available on the retail market.

lihood of success on the merits and that the balance of hardships tilted decidedly toward defendant. At that time, we granted plaintiffs leave to renew their application for a preliminary injunction in connection with an expedited trial on the merits. A bench trial commenced on November 21, 1983 and ended on December 7, 1983. The following shall constitute the Court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. *The Development of the Care Bear*

In January and February of 1981, marketing executives and various creative groups employed by plaintiffs convened with the purpose of developing a multi-character plush bear line, as a follow-up to their highly successful co-venture marketing the doll "Strawberry Shortcake." During the summer of 1981, internal presentations of Care Bear artwork and marketing plans were made before personnel employed by the Kenner, Fun Dimensions and Parker Brothers Divisions of plaintiff CPG Products Corp. For approximately one year, through the summer of 1982, plaintiffs attempted to translate two dimensional Care Bear artwork into attractive and saleable three dimensional plush bear toys. Throughout most of this period, certain prospective licensees were invited to view the evolving Care Bear product line and promotional plans, and, after a June 24, 1982 seminar in New York City for 26 licensees already committed to the Care Bear project, "word began to get out somewhat that American Greetings and General Mills [the parent company of plaintiff CPG] were joining forces on a second project." Testimony of John Chojnacki, Co-president of American Greetings licensing group, Trial Transcript ("Tr.") at page 94.

The Care Bears project was introduced to the marketplace in August 1982, as "teams from General Mills and MAD [the "Marketing and Design" division of CPG] went out into the marketplace and gave individual presentations to approximately 50 major retailers throughout the country...." *Id.* at 96. On September 24, 1982, The Wall Street Journal published a detailed article about the project, and in October 1982, an introductory trade ad, a fold-out brochure depicting color cartoon drawings of the Care Bears, entitled "Introducing a Story About Love," appeared in "a variety of trade journals covering the toy business, ready-to-wear, domestic and stationery, greeting card business." *Id.*

The Care Bears themselves did not reach retailers' shelves until March 1983, over two years after the project was first conceived. The product, promoted extensively in national magazine and television advertisements, was an instant success, "by about five times the most successful introductory launch of a new product" in American Greetings history. *Id.* at 82. We understand that demand far outpaces supply, and that the Care Bear may become the stuffed animal equivalent of the Cabbage Patch Kid Doll.[5]

### II. *The Care Bear*

The Care Bear, in both pictorial and sculptural forms, has several primary physical characteristics, which we shall describe below in the approximate order of their importance to the toy's selling and emotional appeal.

Each of the bears has a prominent symbol on its chest. The symbols reflect each bear's distinct personality and emotion. As described by Mr. Chojnacki, "Care Bears are designed to be the embodiment of what traditionally would be intangible human emotions," Tr. at 108. *See also id.* at 105, 110. This theme has been reinforced by a multimillion dollar marketing campaign. Focusing only on the stuffed bears, we note the appearance of the following graphics:

---

5. For further information on the hot-selling Cabbage Patch Kid Doll, *see* New York Times, November 29, 1983, p. A17. *See also* New York Times, December 1, 1983 at p. B8 (advertisement setting exchange rate for Cabbage Patch Doll: Buy at $40; sell at $50).

| Name of Bear | Graphic |
|---|---|
| Bedtime Bear | Sun and moon |
| Birthday Bear | Cupcake with candle |
| Cheer Bear | Rainbow |
| Friend Bear | Entwined sunflowers |
| Grumpy Bear | Cloud |
| Tenderheart Bear | Heart |

The chest graphic generally correlates with the toy's facial expressions. Hence, Grumpy Bear has a frown on his face; and Bedtime Bear has half-closed eyelids.

The bears have pear-shaped heads and overstuffed jowls. Their eyes are set relatively close together; a plastic heart-shaped nose appears near the top of their white muzzles. The bears' heads are approximately the same size as their torsos.

Most of each bear's body is covered by a soft, low-pile, pastel-colored fur.[6] The back paws of these animals are delineated with heart-shaped pieces of white plush; this white material is also the backdrop for the symbols on the bears' chests. Small tufts of hair protrude from the top of the heads of both the stuffed and pictorial versions of the bears. Each bear wears a tiny red plastic heart, carrying the designation "Care Bear," on its bottom and described by plaintiffs' witnesses as a "toushee tag."

The ten inch Care Bear sits in cardboard boxes on retailers' shelves. The name of each bear is prominently featured on each box. A small brochure is attached to each bear. This brochure describes each bears' peculiar attributes. Thus, the "Birthday Bear" sits in a box labelled "Birthday Bear" and carries a brochure stating, *inter alia*, "Gosh, I just love parties so much, I'm already planning yours. I'd never let a year go by without you and me celebrating your very special birthday."

### III. *The Development of the Message Bear*

It is defendant's contention that its bear was created independently from the Care Bear. In support of this position, defendant denies that it had any access to the Care Bear character prior to late October of 1982, by which time defendant's bear was well along in the developmental process. Defendant has offered testimonial and documentary evidence to this effect. Plaintiff contends that defendant's testimony is fabricated, questions the authenticity of defendant's key documentation, and contends that this fabrication is itself an indication of defendant's awareness that it is an infringer. However, we find the following to have occurred.

In accordance with his usual practice, Stanley Geller, defendant's president, travelled to the Orient in early October, 1982, in order to meet with various toy manufacturers and to attend Korean and Taiwan toy fairs. According to Mr. Geller, he brought with him a small brown stuffed bear which was part of defendant's toy line. This bear, which was introduced as an exhibit, is approximately eight inches tall and has a head similar in shape to the Message Bear head. Mr. Geller contends that he told Luke Yao, the proprietor of "Superone," a Taiwanese stuffed toy manufacturer, that he wanted Mr. Yao to make up samples with similar shaped heads, in "bright colors" and larger sizes, for possible use in defendant's line. Mr. Geller says he combed Mr. Yao's well-stocked showroom, designating various features found in samples on display which he wished to incorporate in the Message Bear. In particular, he claims the floppy legs with flat, knob-like "paws" and roughly delineated "claws," a distinctive characteristic of the Message Bear, derived from another animal in Yao's showroom.

The principal evidence against "independent creation" of the Message Bear is a letter, dated October 22, 1983, from Neil Siskind, second-in-command at Fun World, to Geller. It is undisputed that this letter arrived at the end of October, just before Mr. Geller left Taiwan and Yao's factory. It reads, in pertinent part,

---

**6.** See *supra* note 1.

Dear Stan:

Enclosed is what will be the new Strawberry Shortcake popular type item from American Greetings. Kenner will be marketing these bears. I think we should be in it for this coming Toy Fair.

If we use existing bears that we have in the line such as 8235 and 8250, we might be able to predate their copyrights.

The key to their unique look is the unusual colors and the markings on the chest.

We suggest you bring back with you samples of 8250 and 8235 in these bright colors but in the meantime, I will have either Arthur or Milt Lasser work on some chest treatments.

Accompanying this letter was the introductory trade brochure, featuring cartoon depictions of the "Care Bears," which we previously mentioned. By defendant's own admission, this brochure was shown to Mr. Yao. Mr. Geller believed he left the brochure with Mr. Yao but Mr. Yao testified that Mr. Geller took it with him.

Despite Mr. Geller's and Mr. Yao's assertions to the contrary, we find that this brochure and the Care Bear concept in general had some influence in the creation of the Message Bear. We believe the Message Bear project was in motion before the time when defendant could fairly be charged with knowledge of plaintiff's plans. We place this point in time at the end of October, 1982.[7] At most, news of the Care Bear project increased defendant's resolve to proceed with the production of Message Bears, accelerated such

production, and influenced defendant's marketing strategy. Consciously or otherwise, Yao may well have had the Care Bears in mind in fashioning the samples of the Message Bears. For example, early in 1983, Mr. Yao sent to defendant several sample bears. These bears, like Care Bears, and unlike the final version of the Message Bears, had symbols on their chests and felt heart-shaped noses. Yao's exposure to the Care Bear brochure and his obvious familiarity with Care Bears, buttresses our finding that Care Bears were a factor in the creation of these samples.[8] We find that Mr. Yao, after seeing the brochure, thought Mr. Geller wanted a bear more closely resembling the Care Bear. For whatever reasons—including perhaps even a desire to minimize the risk of suit—this was not the case and the symbols and heart-shaped nose were replaced.

Our finding regarding the Message Bear's origins has been informed in part by Mr. Yao's testimony and his diary entries concerning his October 1982 meetings with Geller. Such evidence indicates that the Message Bears project was launched prior to Geller's receipt of the above-quoted letter and brochure. During the trial, Mr. Yao identified the showroom piece from which Geller, in early October, chose several Message Bear features. This exhibit, a mouse with long, floppy legs and a pear-shaped head, closely resembles the Message Bear. Its unusual hind legs and paws are almost identical to those of the Message Bear. Moreover, Yao's diary entries

---

7. We recognize that limited exhibitions of plaintiffs' project were taking place prior to October 1982, and that The Wall Street Journal, a newspaper generally read by defendant's executives, published an article on Care Bears in late September. *See* Wall Street Journal, Sept. 24, 1982 at 56.

Siskind and Geller, however, the two head executives of a small company, were in such frequent communication about defendant's operations that Siskind surely would have known if Geller went to the Orient with a pre-existing plan to produce a Care Bear copy. That Siskind felt it necessary to introduce Geller to the Care Bear concept, via the letter of October 22, 1982, rebuts any argument that Geller, the party responsible for the development of the Message

Bears, had knowledge of Care Bears prior to the end of October.

8. It is clear that the term "Care Bears" was a point of reference sometimes used by defendant and Yao to describe the evolving Message Bears. Telexes between the two refer to "Care Bears" and a two-page letter of November 16, 1982 from Geller to Yao reads, in part:

Care Bears—You will recall the day I left, I discussed with you, using very bright colors on plush bears. This was in the hotel the day I was leaving. You were to make up samples, using bright colors on 8235 and your #1027 and #1027A. Please rush these to us.

*See also supra* n. 2.

reflect that discussions about the bear project took place in early October,[9] many days before Mr. Geller received Siskind's letter.

Yet, the evidence that speaks most clearly about the Message Bear's origins is the animal itself.

## IV. *The Message Bear*

The Message Bear is a pleasant-faced creature composed largely of medium or even shaggy length plush. Its most striking features are its four various colors, its "message," and its prominent feet. Indeed, the bear's hind legs and paws are one of its most distinctive features. After viewing many stuffed animals of this species during the course of this trial, we find that these legs are unusual, having an equivalent only in the feet of the showroom pieces from which, according to Yao and Geller, these feet were appropriated.

## CONCLUSIONS OF LAW

### I. *Copyright infringement*

■ To establish a claim for copyright infringement, plaintiffs must show (1) ownership of a valid copyright and (2) copying by the defendant. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 499 (2d Cir.1982) (citing cases). Taking judicial notice of the fact that the stuffed bear is among the most common of stuffed toys and that "the threshold question" in considering the first element of a copyright claim is "what characteristics of [plaintiffs'] design have gained copyright protection," *id.* at 500, we find that Care Bears are copyrightable works of art. The total creation, embodying the unique chest symbols, body shape, color, "toushee tag," heart-shaped nose, are of sufficient originality to render the introductory brochure and the three dimensional toys derived from the cartoons in the brochures, copyrightable. We reject defendant's contention that the Care Bears are not copyrightable because they are entirely derived from "prior art." [10]

■ Because direct proof of the second element is seldom available, copying may be proved circumstantially by showing that the defendant had access to the copyrighted work and that the two works are substantially similar. *Id.; Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir.1977). The defendant may then rebut this showing by demonstrating independent creation of the challenged work. 558 F.2d at 1092 n. 2.

■ To further sharpen the issues before us, we note that the evidence of independent creation, largely Yao's testimony and that of Geller, is not of such persuasiveness as to rebut an inference of copying based on access and similarity. As noted above, we reject Yao's contention that the Care Bear brochure had no impact on his decision to use graphics in an early prototype. Moreover, though we found defendant's project began without knowledge of the Care Bears, it is clear that defendant and Mr. Yao had access to plaintiffs' de-

---

**9.** As Mr. Yao's testimony indicates, it is difficult to put a precise date on these entries, because Yao sometimes neglected to transcribe notations in their proper places. But transcriptions were never off by more than a few days and an entry on the Message Bears, which refers to an upcoming October 7, 1982 conference, was obviously transcribed before that date.

**10.** Plaintiffs claim copyrightability in the shape of the toy alone apart from the graphics, color, tag and other indicia. Moreover, plaintiffs claim defendant infringed its copyright by copying the body shape of the toy especially as depicted in its brochure.

Plaintiffs further assert that the Care Bear is in a 1:1:1 proportion, *i.e.,* the head is equal in size to the torso and equal in size to to the legs and that this unique proportion gives to the Care Bears a special cuteness. Defendant denies copying the body shape of the Care Bears and asserts that a 1:1:1 proportion is not unusual in stuffed toys.

We need not decide whether Care Bears are copyrightable solely as to shape as a work of sculpture. Plaintiffs did not seek to copyright the toy without its graphics, color and other attributes. Nor need we resolve the question whether a copying of the body size alone would constitute an infringement because we find significant differences in the shapes of the two bears.

signs in the formative stages of Message Bear development. Such access occurred sufficiently prior to the Message Bears' introduction into the marketplace so as to permit an inference of copying, despite the independent origin.

The question, then, becomes one of "substantial similarity." Traditionally, courts in this Circuit, facing this question, have applied the "ordinary observer test" and asked whether the similarity between the products would lead "the average lay observer ... [to] recognize the alleged copy as having been appropriated from the copyrighted work." *Herbert Rosenthal Jewel. Corp. v. Honora Jewel Co., Inc.*, 509 F.2d 64, 65 (2d Cir.1974) (citing early cases). In applying this test, courts must attend to both the similarities and the differences between the works at issue, *cf. Warner Bros. Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231 at 241 (2d Cir.1983), for "numerous differences tend to undercut substantial similarity," and a defendant may avoid infringement by "intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar." *Id.* at 241.

■ Apart from the fact that both plaintiffs and defendant have created bears, and thus their works, of necessity, would share some common ground, we find little to support a claim of "substantial similarity." The similarities are essentially those of color and size. Both plaintiffs' and defendant's bears are depicted in colors not found in nature, and they share similar head to torso ratios. Yet, we can hardly characterize these similarities as "striking." Indeed, the "average lay observer" would perceive not appropriation, but striking differences notwithstanding those similarities inherent in most plush stuffed toy bears.

The most distinctive characteristic of the Care Bear is its chest symbol. This symbol epitomizes the toy and all of the characteristics which plaintiffs sought to embody in it. It does more than convey a literal message to the viewer; it encompasses the bear's emotional makeup and personality. The bears' facial expressions reinforce this concept, as does an expensive advertising campaign. The stuffed version of the Care Bears are sold in boxes with brochures attached, which similarly suggest the bears' various temperaments.

The Message Bear in no way captures the "total concept and feel" of the Care Bear. *Warner Bros., Inc., supra,* at 241 (citing cases). Its rough equivalent to the chest symbol—an embroidered slogan—has a wholly different impact on the observer. These slogans tell us little or nothing about their wearers, just as posters or bumper stickers tell us nothing about walls or automobiles. The slogans are similar in usage, impact and meaning to the sayings that have historically been emblazoned on the chests of many T-shirts and even stuffed toys. The facial expressions of all Message Bears are identical; and they are known only generically as "Message Bears," and not by individual names. The bears have no discernible personalities.

A second central difference between the Care Bears and Message Bears concerns their respective trade dress. The stuffed Care Bear sits in a cardboard box carrying the bear's name, from which the animal can readily be seen by potential purchasers. These boxes are necessarily placed on shelves. Message bears, by contrast, are "bin" or "bulk" items. They have no packaging and no accompanying brochure (a paper tag identifies the product as a Fun World item). They are "displayed" generally in bins near checkout counters or are attached, by a small string, to hooks. They retail at between five and seven dollars, in contrast to a retail price of between $16 and $21 for the Care Bears.

We thus observe that two of the main factors upon which Judge Sarokin relied in granting plaintiffs preliminary injunctive relief in another action—similarity of chest graphics and packaging—are simply not present here. *See American Greetings Corp. v. Dan Dee Imports, Inc.,* slip op. 83–4246 (transcript) (D.N.J. November 9, 1983) (opinion rendered in prose) and *American Greetings Corp. v. Dan Dee Imports, Inc.,* slip op. 83–4246 (D.N.J. Nov.

29, 1983) (poem). Yet, there are numerous other differences between Care Bears and Message Bears, the cumulative effort of which clearly undercuts substantial similarity. *See Warner Bros., Inc., supra,* at 241.

Proceeding roughly from head to toe (or "paw"), we will briefly highlight these differences. Preliminarily, we note that the plush covering the bulk of the Message Bear is significantly longer in pile than the Care Bear plush, giving the former a fuzzier or shaggier appearance. At the top of the Care Bear's head is a color-coordinated tuft of hair; at top of the Message Bear's head is a loop of gold string, to facilitate the use of hooks. The Message Bear's ears are noticeably larger than the Care Bear's, and they are set more widely apart. The Care Bear has eyebrows; the Message Bear does not. The Care Bear has more exaggerated cheeks and a larger head.[11] It has a heart-shaped nose, and a wide rounded muzzle, with dots to represent whiskers. The Message Bear has a pointed muzzle, capped with a non-descript plastic nose. It has no whiskers. The Message Bear has plastic, button-like eyes, common to many stuffed toys, whereas the Care Bear has flat painted eyes, unlike many we viewed during the trial.

We have described only facial characteristics shared by all Care Bears, for as noted, facial expressions vary among the types of bears. All Message Bears, in contrast, have a common facial expression.

The Care Bear has front paws or "hands" marked by white, low-pile plush.

The Message Bear does not have hands delineated by color. The Care Bear has a white circular chest patch; the white area on the Message Bear torso is far larger in size, extending fully to the sides and backside of the bear. A small plastic heart (the "toushee tag"), saying "Care Bears," is tacked on the backside of the stuffed Care Bear; there is no such attachment on the Message Bear.[12]

The Message Bear has unusual hindquarters, about which we have previously commented, which set it apart from the Care Bear and other creatures.[13]

In sum, at most it can be said that the Message Bear "stirs one's memory" of the Care Bear—and visa versa. This is clearly insufficient to make out a claim of copyright infringement. *See Warner Bros., Inc., supra* at 242. Indeed, while it is often said in these cases that a second comer may utilize the ideas of another, *see, e.g., Herbert Rosenthal Jewel. Corp., supra,* 509 F.2d at 65 (protection given only to the "expression of the idea"), we do not even believe this occurred. Plaintiffs' introductory trade ad (the brochure Siskind mailed to Geller) adequately described the Care Bear idea:

> Care Bears are not your run-of-the mill kind of bears. Uh uh. They're a very special collection of loveable little bears, each with a very special purpose: to help us share and express our emotions and feelings.

**11.** Indeed, the head of the larger stuffed Care Bear clearly overwhelms its torso and makes its hind legs appear dwarf-like. The Message Bear has more balanced body proportions.

**12.** Another company selling stuffed bears strives for uniqueness and brand identification by sewing a button in the toy's ear. See Advertisement for Steiff ("the authentic Button-In-Ear brand"). The New Yorker, Dec. 5, 1983, p. 122.

**13.** *See supra* pp. 611, 612–613. Though plaintiffs have generally accurately "translated" cartoons of the Care Bears into stuffed toys, the stuffed bears' limbs are noticeably different from their pictorial counterparts. The cartoon bear has plump back paws and articulated joints and digits. By contrast, the stuffed Care Bear has rather simple back limbs and small back paws. Movement is limited, and in fact, the small Care Bear's back legs do not move at all. The use of heart shapes in the paw area represents the sole common denominator between the sculptural and pictorial versions of the Care Bears. While the Message Bear's back legs do not have this characteristic, they are similar to the pictorial Care Bear back legs in other respects. Namely, the Message Bear has "knee" joints, pronounced paws and digits, as represented by two strings of yarn. Yet, we would characterize such similarity as superficial and not "substantial," particularly in light of the strong evidence of independent creation of the hind legs. *See supra* p. 614.

When you're happy or feeling blue. When you need a friend to share birthday wishes or bedtime dreams, there's a Care Bear that echoes your every mood.

And a Care Bear tummy tells you just what its particular mood is. 'Cause every Care Bear has its very own personal tummy graphic which matches that bear's individual colors and personality. It makes Care Bears as collectible as me and all my friends from Strawberryland.

Defendant, by contrast, did not set out to create a family of emotionally different bears. Its aims were more modest, and, while we hesitate to characterize the result as "a run-of-the-mill kind of bear," we find the Message Bear reminiscent of many stuffed creations we viewed at trial and not "substantially similar" to the Care Bear. Because its product is not "substantially similar", defendant did not infringe plaintiffs' copyright.

## II. *Trademark Infringement*

"As in all trademark and trade name infringement cases, the crucial issue is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Plus Products v. Plus Discount Foods,* 722 F.2d 999 at 1003 at 7206 (2 Cir.1983). Our previous discussion applies in large part to the Lanham Act issue as well, because " 'the absence of substantial similarity leaves little basis for asserting a likelihood of confusion or palming off.' " for the purposes of plaintiffs' trademark claim. *See supra Warner Bros., Inc.* at 241. What little remains of this claim quickly dissolves under further scrutiny.

■ First, plaintiffs have presented only the weakest evidence of actual confusion, as to source or sponsorship. *See Plus Products* at 1006 (lack of evidence of actual confusion is strong indicator that the likelihood of confusion is minimal). One of plaintiffs' account representatives testified that, while in a toy store, she overheard a young girl of five or six say to her mother, in reference to the Message Bears, "Look, ma, there are the Care Bears." Tr. at 363. Even if this child was actually confused, it is *buyer* confusion that the Lanham Act addresses. *Cf. id.* More importantly, in light of the numerous times when plaintiffs' salespersons would have occasion to observe sales of Care Bears and other products in the marketplace, we can only view this report as an isolated episode, not indicative of either actual confusion or the likelihood thereof. *See B.D. Communications, Inc. v. Dial Media, Inc.,* 429 F.Supp. 1011, 1014–15 (S.D.N.Y.1977) ("ultimate test ... is whether an appreciable number of ordinarily prudent prospective purchasers are likely to be deceived"). The same must be said about the signs two retailers, without prompting by defendant, displayed near the Message Bears. Moreover, these signs, reading "Fun World Bears That Care" and "Care Bear Cousins" may as reasonably be interpreted as attempts to clarify the product's source as attempts to confuse the buyer.

■ Against this weak showing of actual confusion, we have the testimony of Richard Litvak, the owner of four toy stores and several other outlets selling primarily toys and sportswear. At these stores, he sells both Care Bears and Message Bears. He transacts about 80 million dollars worth of business with Kenner and 15 million with Fun World. He testified that in his day-to-day contact with his stores and approximately eighty sales persons, he had never heard Care Bear being mentioned in connection with the Message Bears. Asked if Care Bears and Message Bears are competitive items, he responded "Absolutely not" because they involve "Two separate customers, two separate concepts, two separate markets, two separate merchandising procedures." "One is a carnival plush-type toy that is an impulse buy. The other one is a hot T.V. toy heavily promoted with millions behind it." Tr. at 481–82.

We find Litvak's testimony credible and corroborative of other testimony that we have heard and the inferences logically drawn from such testimony. It is extreme-

ly *unlikely* that the purchaser will believe that the Message Bears are sponsored by the same persons who sell Care Bears. Of primary importance are the differences in trade dress. Message Bears are "bin" items, sold on "speed" tables or attached to hooks near the checkout counters. Care Bears, by contrast, come in display boxes and are sold from shelves, as described above.

Furthermore, defendant has minimized the risk of confusion by appending to its bears a prominent tag reading "Fun World." Defendant's bears have no equivalent to the heart-shaped "toushee tag" used to identify plaintiffs' products as "Care Bears."

It is also appropriate to consider differences in price and quality. *Cf. supra Plus Products* at 1006–1007. Plaintiffs' Care Bears sell wholesale at approximately three times the wholesale price of Message Bears. And a difference in quality and appeal is readily apparent. Plaintiffs' bears are more elaborately constructed than defendant's, utilizing several additional pieces of fabric and different facial expressions for different bears. Though both parties sought "cuteness," plaintiffs have gone to far greater lengths to achieve this effect.

Finally, we believe it appropriate to comment on the evidence of relatively heavy Message Bear sales that plaintiffs have introduced. Some of this no doubt can be attributed to this being the 75th Anniversary of Teddy Bear. Toy stores and book stores abound in stuffed bears and in stuffed bear paraphernalia—some of which we viewed at trial. Surely, many vendors, such as defendant, are benefitting by their fellow vendors' efforts to popularize or revitalize the stuffed bear. This is perfectly permissible under the trademark laws. "[O]ne can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 662 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). While defendant may have capitalized on an enhanced demand for stuffed bears, surely caused to some extent by the promotion of Care Bears, it did not do so by confusing consumers.

Because essentially the same criteria apply to plaintiffs' state law unfair competition claim, *see supra B.D. Communications*, 429 F.Supp. at 1014 n. 4 (citing cases), we also find that defendant has not violated state law.

For the foregoing reasons, plaintiffs have not demonstrated a violation of federal copyright or trademark law or New York State law and defendant is entitled to judgment on the merits.

SO ORDERED.