**ORIGINAL APPALACHIAN ART-WORKS, INC., Plaintiff,**

v.

**BLUE BOX FACTORY (USA) LTD., Defendant.**

**No. 83 Civ. 8917 (ADS).**

United States District Court, S.D. New York.

Dec. 21, 1983.

Wyatt, Gerber, Shoup, Scobey & Badie, New York City, Birch, Hartness & Link, P.C., Gainesville, Ga., William H. Needle, Atlanta, Ga., for plaintiff; Gerard F. Dunne, New York City, Stanley F. Birch, Jr., Atlanta, Ga., of counsel.

Coudert Brothers, James M. Rhodes, Jr., Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for defendant; Richard N. Papper, Paul S. Friedland, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

Plaintiff Original Appalachian Artworks, Inc., originator of a line of enormously popular dolls known as the "Cabbage Patch Kids," alleges copyright infringement in violation of section 101 of the Copyright Act of 1976, 17 U.S.C. § 501, and unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of New York, by defendant Blue Box Toy Factory (USA) Ltd. Appalachian requests preliminary injunctive relief.

Xavier Roberts, a Georgia artist, began producing the earliest progenitors of the Cabbage Patch Kids with the help of a friend in May 1977. Roberts incorporated Appalachian the following Fall, and in June 1979 he and his company obtained a copyright certificate for the dolls. *See Original Appalachian Artworks, Inc. v. The Toy Loft, Inc.*, 684 F.2d 821, 823 (11th Cir.1982). In December 1979 Roberts assigned his rights in the copyright to Appalachian. Osborne Affidavit at 2. Employing an inventive array of marketing ploys, including offering the dolls for "adoption" rather than sale, making each "unique," endowing each with a name, providing the buyer with a birth certificate and adoption papers, and promising to send each doll a birthday card, Appalachian "achieved considerable commercial success" with the dolls, then known as "The Little People." *Original Appalachian Artworks, Inc.*, 684 F.2d at 823; *see* Osborne Affidavit at 3–4.

In August 1982 Appalachian granted Coleco Industries, Inc. an exclusive license to manufacture, sell, and distribute its dolls, which were dubbed the Cabbage Patch Kids. *Id.* at 3. Coleco's formal introduction of the dolls at the New York Toy Fair of February 1983, the major event of its kind in the toy industry, evoked great interest and generated numerous orders. Berger Affidavit ¶ 2. Coleco then initiated a massive advertising campaign, Hirsch Affidavit ¶ 2, which helped turn the Cabbage Patch Kids into a phenomenon on the order of the "Hula Hoop," the "Pet Rock," and other comparable triumphs of the American toy industry. Despite a well-publicized shortage of supply, sales of the dolls are predicted to surpass 2.5 million this year, making the marketing campaign "the most successful doll introduction in history." Berger Affidavit ¶ 6. Some fifty-two companies have obtained licenses to produce "Cabbage-Patch" products, and the media have focused intense attention on the dolls and the frantic efforts of many shoppers to purchase them, *see, e.g.*, What A Doll!: The Cabbage Patch Craze, *Newsweek*, Decem-

ber 12, 1983, at 78 (cover story); The Strange Cabbage Patch Craze, *Time,* December 12, 1983, at 64.

The defendant, Blue Box, has also produced a line of "soft-bodied" dolls, which it markets as the "Flower Kids." Appalachian seeks to prohibit Blue Box from reproducing or selling its dolls, and to have all the "Flower Kids" now in defendant's possession and control seized and destroyed, along with the allegedly confusing trade dress and promotional materials accompanying defendant's doll. The parties appeared in court on Friday, December 9, 1983, to argue plaintiff's request for temporary relief. Defendant's counsel had at the time submitted only an affidavit, having had no opportunity to prepare a memorandum of law or even to ascertain his client's view on several of the underlying factual issues. Decision was therefore reserved on the request for temporary relief, and the parties were invited to submit further clarifying materials and argument. After submissions, an Order was issued on December 10, 1983, denying temporary relief and setting a hearing on the motion for a preliminary injunction for Tuesday, December 13, 1983.

At the preliminary injunction hearing, plaintiff presented new evidence including samples of noninfringing dolls and a survey of consumers at shopping malls to demonstrate that they may confuse Flower Kids with Cabbage Patch Kids. Plaintiff also called Dr. Joyce Brothers, the well-known psychologist, to testify concerning the allegedly unique psychological appeal of Cabbage Patch Kids, and presented evidence from two officers of Coleco concerning the special merchandising and characteristics of plaintiff's doll. Blue Box in turn presented the expert testimony of Mr. Yaffa, who before his recent retirement served for some forty years as principal doll buyer for an unaffiliated toy company.

### I. *Standard for Preliminary Injunctive Relief.*

■ To obtain preliminary injunctive relief in this Circuit, a party must make "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Appalachian has proceeded diligently and might suffer irreparable injury, given the nature of claims under the Copyright and Lanham Acts. *See Uneeda Doll Co. v. Goldfarb Novelty Co.,* 373 F.2d 851, 852 n. 1 (2d Cir.1967) (copyright); *Paco Rabanne Parfums v. Norco Enterprises, Inc.,* 680 F.2d 891, 894 (2d Cir.1982) (trade dress) (citing *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971) (trademark)); *Dreyfus Fund v. Royal Bank of Canada,* 525 F.Supp. 1108, 1111 (S.D.N.Y.1981) (trademark). *But see Ideal Toy Corp. v. Kenner Products,* 443 F.Supp. 291, 309–10 (S.D.N.Y.1977) (though possibility of harm to product's reputation "not readily calculable in dollars and cents," irreparable injury must be established by "objective evidence," not "pure speculation"). The balance of hardships tips decisively in neither direction, however. On the one hand, issuance of the restraining order might prevent Blue Box from taking advantage of the intensive shopping activity of the holiday season; on the other hand, allowing a qualitatively inferior imitation of Appalachian's Cabbage Patch Kids into the market might dispel the aura presently attached to them. Thus, to obtain preliminary injunctive relief Appalachian must demonstrate likelihood of success on the merits, which it has failed to do.

### II. *Copyright Infringement.*

■ Blue Box makes no issue on this motion of copyright ownership or access. Appalachian's copyright claim therefore turns on whether the parties' dolls are "substantially similar." *See Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498,

499–500 (2d Cir.1982); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 911–12 (2d Cir.1980). "It is an axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). The differences and similarities are not to be assessed separately, but rather the dolls should be evaluated in "total concept and feel." *Warner Bros. Inc. v. American Broadcasting Co.*, 720 F.2d 231, 241 (2d Cir.1983) ("*Warner Bros. II*") (quoting *Roth Greeting Cards v. United Cards Co.*, 429 F.2d 1106, 1110 (9th Cir.1970)). Unlike a story, which has a linear dimension,

> a ... three-dimensional work is created to be perceived as an entirety. Significant dissimilarities between two works of this sort inevitably lessen the similarity that would otherwise exist between the total perceptions of the two works.

*Id.* at 241.

Blue Box has undoubtedly attempted to capitalize on consumer demand for "soft-sculpture," infant-sized dolls, a demand presently generated in large part by Appalachian's product. Mr. Lewis, whose firm served as sales representative for Blue Box in the United States, and who testified that he had served as "consultant" to Blue Box on the development of the Flower Kids line, stated that Blue Box executives had indicated that they wished to "add[ ] another line ... to take advantage of an existing market phenomenon." Transcript at 11–14. Blue Box's Flower Kids are in fact at first glance superficially similar to Cabbage Patch Kids. They are approximately the same size, both have yarn hair, both are made of a soft material, and their facial and bodily features resemble those of human babies. But the presence of features which dolls universally bear does not prove infringement, *see Eden Toys*, 675 F.2d at 500, and significant dissimilarities are apparent upon cursory examination. Flower Kids differ from Cabbage Patch Kids in precisely those characteristics for which Appalachian's product has attained notoriety. The Blue Box dolls lack the physical qualities for which Appalachian's dolls are best known: a distinctively recessed chin, realistic skin, dimpled knees, and life-like bodily features such as a belly button, "a cute tush," "ten real fingers and ten real toes," and feet capable of creating footprints. Defendant's Exhibit A (text of Cabbage Patch advertisement). In addition, the Cabbage Patch Kids are dressed in disposable diapers and have pajamas, stockings, or removable shoes on their feet, while the Flower Kids wear no diapers and come with nonremovable vinyl booties.

Although the determination as to substantial similarity is necessarily "ad hoc", *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (L. Hand, J.), an examination of other doll and toy cases in the Second Circuit demonstrates that any similarity between the Cabbage Patch Kids and the Flower Kids is insufficient to support an inference of copying. *See Eden Toys*, 675 F.2d at 500–01; *Durham Industries*, 630 F.2d at 915–17; *Ideal Toy Corp. v. Kenner Products*, 443 F.Supp. at 303–04; *American Greetings Corp. v. Easter Unlimited, Inc.*, 579 F.Supp. 607, 614–615 (S.D.N.Y.1983). In *Eden Toys*, the court affirmed the grant of summary judgment dismissing an action alleging infringement of the copyright in a toy snowman. After purchasing Eden's product for sale during the 1978 holiday season, Marshall Field placed a sizeable order for a comparable item with a Korean manufacturer that had agreed to make several changes. These alterations arguably increased the item's resemblance to Eden's product. The Second Circuit agreed with the district court that any similarity between the two products "would appear to the ordinary observer to result solely from the fact that both are snowmen." 675 F.2d at 500. The court observed that the two snowmen were of approximately the same size, wore a hat and scarf, and had black button eyes approximately one-half inch in diameter, V-shaped mouths, and two red

buttons. But it found no substantial similarity, relying on differences in the overall shape of the snowman, the one "in block form," the other "in the traditional rounded shape;" differences of less than an inch in the spacing between the eyes, the size of the noses, and the length of the lips; and differences in the color of their scarves, in the style of their hats, and in the texture of the materials from which they were made. *Id.* at 500–01. The court concluded that "[e]ven if an alleged copy is based on a copyrighted work, 'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiffs.'" *Id.* at 501 (quoting 3 *Nimmer on Copyright* § 13.03[B], at 13–37 (rev. ed. 1980)).

The Second Circuit in *Durham Industries* affirmed the district court's grant of summary judgment dismissing a series of counterclaims alleging copyright infringement and unfair competition. In the portion of the opinion most relevant here, the court considered three pairs of small plastic dolls, one trio copyrighted, the other allegedly infringing, and found no substantial similarity. Discussing the pair of dolls representing diaper-clad crawling babies, for example, the court observed, "[t]hat the idea behind each toy is the same is evident from a viewing of the toys, and the inference that Durham conceived of the *idea* for its doll only after viewing Tomy's toy is not an unreasonable one." 630 F.2d at 915 (emphasis in original). Despite the fact that the dolls were identical in size, proportion of head to body, shape of face, and "wide-eyed 'kewpie doll' appearance," the court found that differences in gender, color of hair and diaper, skin tone, and facial features constituted a sufficiently distinct expression of the "possibly copied idea." *Id.*[*]

In *Ideal Toy Corp. v. Kenner Products,* plaintiff sought a declaration that its production and distribution of certain toys un-

der the trademark "Star Team" did not constitute copyright infringement and unfair competition. 443 F.Supp. at 293. Defendant, holder of a license from the producer of the film "Star Wars" to produce toys based on characters from the film, counterclaimed, but the court denied its motion for a preliminary injunction. Ideal conceded that it had produced the "Star Team" toys from models in its archives in order to capitalize as soon as possible on the space toy fad generated largely by the movie. In the course of a comprehensive and instructive opinion, Judge Tenney stated that he had "no doubt, and Ideal did not deny, that Ideal sought to make use of the themes embodied in [the] characters and in the movie itself." *Id.* at 304. He emphasized, however, that "even if it were known that the 'infringer' had intentionally copied the theme, no copyright-infringement action would lie." *Id.* at 304. After carefully comparing the toy figures, Judge Tenney concluded that the similarities of expression were not substantial and that Ideal had thus copied at most the unprotectible idea. For example, Ideal's Knight of Darkness resembled Kenner's Darth Vader: both were "large, black-colored figures sporting capes and black helmets." *Id.* at 303. But Judge Tenney relied on differences in the appearance of the figures' heads, their tunics, and the weapons they sported to conclude that no substantial similarity existed. The differences between the soft dolls here are at least as substantial.

Most recently, in *American Greetings Corp.*, Judge Sand ruled after an expedited trial on the merits that the plaintiffs, manufacturers of a line of stuffed plush bears known as "Care Bears," had failed to demonstrate violation of the federal copyright or trademark laws or New York law of unfair competition by the importer and seller of another line of stuffed plush bears known as "Message Bears." The Care Bear's distinctive characteristic is a pictori-

---

[*] The pair of dolls representing crawling babies, as well as the pair representing diaper-clad babies walking in a stroller, were admitted into evidence at the hearing on the instant motion.

Both pairs display a significantly stronger similarity in "total concept and feel" than the dolls before this court.

al representation on its chest of an emotion, reiterated in the bear's facial expression. For instance, there is a "Cheer Bear," a "Grumpy Bear," and a "Tenderheart Bear." The Message Bears' chests carry words or phrases, such as "Have a Happy Day." At 609 & n. 1.

Judge Sand found that the trade brochure introducing the Care Bear line and "the Care Bear concept in general had some influence in the creation of the Message Bear," a project already underway, and that "news of the Care Bear project increased defendant's resolve to proceed with the production of Message Bears, accelerated such production, and influenced defendant's marketing strategy." *Id.* at 7. Rejecting as unpersuasive the evidence of independent creation, Judge Sand turned instead to the question of substantial similarity. *Id.* at 10. After noting similarities of color and size, he found that the chest symbol of the Care Bears and the chest slogan of the Message Bears had "a wholly different impact on the observer." *Id.* at 11. In addition, Judge Sand observed that the Message Bears' plush was longer in pile than that of the Care Bears, that the Message Bears' facial features were identical while those of the Care Bears varied from bear to bear, that Message Bears lacked "hands delineated by color" and an identifying tag, and that they had unusual hindquarters. *Id.* at 13–14. He concluded that the Message Bears, whose variation from the Care Bears appears no greater than that of the Flower Kids from the Cabbage Patch Kids, at most "stir[red] one's memory" of the Care Bears. *Id.* at 14–15; *see Warner Bros. II,* at 242. He thus found no substantial similarity.

The testimony of Appalachian's expert, Dr. Joyce Brothers of television, radio, and newspaper fame, confirms the impressions of substantial dissimilarity in this case. The features of the Cabbage Patch Kids which Dr. Brothers identified as accounting for their extraordinary appeal were chiefly common to all dolls or absent in the allegedly infringing Flower Kids. For example, Dr. Brothers mentioned the Cabbage Patch Kids' "softness and cuddliness" and

noted its close approximation to an infant's facial features. *Id.* at 33–34. Neither of these qualities is a feature unique to Appalachian's product. Dr. Brothers also stated that the outstretched position of the arms conveyed a message of "hug-me, hold-me" or "come-to-me," and was a "very unique feature" of the Cabbage Patch Kids, but, as she recognized, this posture is part of the enduring appeal of the teddy bear, companion to countless children for generations. *Id.* at 33–34, 35, 41. Dr. Brothers attributed the Cabbage Patch Kids' popularity in large part to the child's belief, symbolized by the adoption papers, that his or her doll is different from any other, a characteristic Flower Kids do not purport to share.

The survey, too, lends no help to Appalachian's cause. It was an impressive achievement, considering that the data were collected within a period of forty-eight hours after the Court's decision denying temporary relief and appear to have been reliably and professionally obtained. The survey tested consumers at shopping malls who were planning on buying gifts for girls under twelve years of age. The shoppers were interviewed in a room in which a Flower Kid doll was placed on a table. The doll was not packaged, and nothing was left in the room other than the doll, the interviewer, and the interviewee, who was asked: "What is this doll called?" The survey found that some 64% of those expressing an opinion stated some variant of Cabbage Patch Kid.

These findings carry little weight, however. The Second Circuit has recently emphasized the limited utility of survey evidence in establishing the "substantial similarity" necessary to support an inference of copying. *See Warner Bros. Inc. II,* at 244–45; *see also Ideal Toy Corp. v. Kenner Products,* 443 F.Supp. at 304. This survey also failed to replicate actual conditions that appear to exist at the retail stores in which the dolls are sold. Mr. Yaffa stated that, based on his extensive experience, Cabbage Patch and all similar dolls are generally sold in their packages.

His testimony was considerably more reliable and credible than the suggestions of others that the dolls are sold or have been exhibited on television outside their packaging. The cellophane window which encompasses much of the front of the dolls' boxes is obviously designed to enable the prospective purchasers to examine the "Kids" without taking them out of their boxes. The Cabbage Patch Kid in particular needs its package to hold its birth certificate and adoption papers. The survey also did not adequately account for the consumers' general familiarity with a famous doll, the Cabbage Patch Kid, which many have heard about but have not seen. *See id.* at 304. The consumers who were shown a Flower Kid, which until now has not been sold or advertised, may merely have guessed that the soft doll being exhibited must be a Cabbage Patch Kid. The success of Appalachian's marketing efforts cannot be permitted to expand the bounds of the legal protection to which it is entitled.

The record establishes it is unlikely that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966). Blue Box has succeeded in "making sufficient changes in a work that would otherwise be regarded as substantially similar to that of the plaintiffs'." *Warner Bros. Inc. v. American Broadcasting Co.*, 654 F.2d 204, 211 (2d Cir.1981) (quoting 3 Nimmer on Copyright § 13.03[B] at 13–37). The ordinary observer, let alone a would-be purchaser of a Cabbage Patch Kid, would not be disposed to overlook the disparities between these products. *See Peter Pan Fabrics, Inc.*, 274 F.2d at 489.

III. *Unfair Competition.*

Appalachian's most recent submissions emphasize that "the doll is the thing" for purposes of the unfair competition claim. Of course, to the extent that Appalachian asserts rights equivalent to those encompassed by copyright, its claim is preempted by section 301(a) of the Copyright Act of 1976, 17 U.S.C. § 301(a). And even as to nonequivalent rights, "the absence of substantial similarity leaves little basis for asserting a likelihood of confusion or palming off" under the Lanham Act, *Warner Bros. II*, at 246 (quoting *Durham Industries*, 630 F.2d at 918); *see American Greetings Corp.*, slip op. at 15. Given their numerous differences, the dolls themselves are unlikely to contribute to consumer confusion as to source.

In this case, as in *Durham Industries*, the manner in which the dolls are sold "eliminates such a possibility entirely." 630 F.2d at 918. First, the packaging is not likely to engender confusion. "[T]he [doll] figure itself is the most dominant aspect of the packaging as it is fully visible in each package through a transparent plastic window." *Ideal Toy Corp. v. Kenner Products*, 443 F.Supp. at 307. The lack of substantial similarity between the dolls makes consumer confusion less likely than with an opaque box. Second, the similarities in trade dress between the parties' products relate to features that Appalachian cannot claim as its own. The plastic front window on the boxes in which the dolls are sold is a commonly used, functional device for displaying dolls. Third, the boxes used are completely different in other respects. The Cabbage Patch box has detailed instructions and information, mostly relating to the distinctive marketing ploy of "adoption," while that of Blue Box has virtually no writing beyond the "Flowers Kids" logo and the "Blue Box" name. In addition, the Flower Kids' box differs in size, shape, and color from that of the Cabbage Patch Kids. Fourth, Blue Box has not merchandised its dolls with the highly distinctive techniques developed by Appalachian: Blue Box has only four doll types, while Appalachian claims that each of the Cabbage Patch Kids is unique due to computer-supervised variations in skin color, hair, clothing, and other features; Blue Box sells the Flower Kids simply as dolls, without the special accoutrements of adoption papers, birth certificates, and promises of birthday cards which have become so prominent a part of the Cabbage Patch

Kids' appeal; and the Flower Kids do not carry a creator's signature on each left buttock, or on any other part, as do the Cabbage Patch Kids. Finally, the name "Flower Kids," though comprised of common words, might tend to enhance confusion with its vegetable counterpart; but plaintiff cannot assume dominion over such garden-variety names absent stronger similarity in the underlying products.

Finally, the differences in price and quality will tend to inhibit confusion. *See American Greetings Corp.*, at 617; *cf. Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006–1007 (2d Cir.1983) (noncompeting goods). The testimony and exhibits established that, at least before the shortage-induced craze, the Cabbage Patch Kids retailed for about $20 to $25, while the Flower Kids are expected to sell for about $10 to $12. The potential price differential is greater still, since Cabbage Patch Kids wholesale at $18.50 and Flower Kids at about $6.50. The difference in quality between the two items is readily apparent, from the more clearly articulated digits of the Cabbage Patch Kids to their removable shoes.

The survey evidence is equally flawed for purposes of the unfair competition claim, particularly because it failed precisely to target "prospective purchasers," rather than simply shoppers for gifts, *Ideal Toy Corp. v. Kenner Products*, 443 F.Supp. at 308, a consideration especially important amidst the current mania, *cf. Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 427 (S.D. N.Y.1980) ("[a]mong the important factors to weigh in predicting confusion are the sophistication of relevant purchasers, normal market conditions, and the attention purchasers give a product before acting"), *aff'd*, 687 F.2d 563 (1982). Mr. Yaffa convincingly testified that parents contemplating the purchase of a relatively expensive, highly-promoted doll shop with care in the self-help toy shops where most sales now occur. *See* Transcript at 117–18, 121–25. Knowing that the child will be bitterly disappointed by an imitation, the parent looks first for a label that clearly identifies the doll by name, and is unlikely to accept a substitute. *See id.* at 127, 122.

Because the same standards govern the unfair competition claim under New York law, it is also unlikely that Appalachian will prevail on that cause of action. *See Warner Bros. II*, at 248; *American Greetings Corp.*, at 617; *B.D. Communications, Inc. v. Dial Media, Inc.*, 429 F.Supp. 1011, 1014 n. 4 (S.D.N.Y.1977).

The difference in "total concept and feel" between the Cabbage Patch Kids and the Flower Kids makes it unlikely that Appalachian will succeed on its copyright and unfair competition claims. *Warner Bros. Inc. II*, at 246; *Eden Toys*, 675 F.2d at 500. Its motion for a preliminary injunction is therefore denied.

SO ORDERED.